UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| MATTHEW GUMKOWSKI, | * * * | |
| Petitioner, | * * | |
| v. | * * | Civil Action No. 22-CV-11650-ADB |
| SHEILA KELLY, | * * | |
| Respondent. | * * * * | |

**<u>MEMORANDUM AND ORDER</u>**

BURROUGHS, D.J.

Petitioner Matthew Gumkowski ("Petitioner") is serving a life sentence following a conviction for first-degree murder by extreme atrocity or cruelty in the Bristol County Superior Court. Supplemental Answer, ECF No. 20-1 (hereinafter "SA"), at 17–18. Currently before this Court is his petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. For the reasons set forth below, the Court **<u>DENIES</u>** the petition.

## I.    FACTUAL BACKGROUND

In its decision on direct appeal, the Supreme Judicial Court of Massachusetts ("SJC") provided the following account of the relevant facts. *See* SA 476–77 (*Commonwealth v. Gumkowski*, 167 N.E.3d 803, 808–11 (Mass. 2021)); *see also Yeboah-Sefah v. Ficco*, 556 F.3d 53, 62, 66 (1st Cir. 2009) (in habeas case, utilizing factual background from SJC decision given presumption of correctness afforded facts under § 2254(e)(1)).

1

### A. The Crime for Which Petitioner Was Convicted

The victim was found dead at his Attleboro apartment on July 10, 2011. Sometime between 8:30 P.M. and 9 P.M., the victim's downstairs neighbors heard noises that sounded like furniture being moved about. Shortly after 9 P.M., the smoke alarms sounded. When firefighters arrived minutes later, they found the victim's body lying on the floor at the foot of the bed. The fire that had started on the victim's bed was no longer active, the sprinklers were on, and the contents of the room were soaked. The victim had been beaten, strangled, and stabbed. A medical examiner testified that, based on the bleeding, the victim was likely alive when he suffered the blunt force injuries, but was already dead or near death when he was stabbed.

SA 476.

### B. The Investigation

[Petitioner] knew the victim and had bought drugs from him in the past. In July 2011, [Petitioner] was using approximately a gram of heroin per day. On the morning of July 10, [Petitioner] visited the victim's apartment, hoping to sell him a ring. The victim knocked on the door of his neighbor across the hall—a former jeweler—and asked him to look at the ring. When the neighbor looked at the ring, he expressed skepticism about its value. The neighbor saw another man standing in the victim's apartment; the neighbor described the man as white, with a medium build and blonde hair. The neighbor later identified [Petitioner] as the man who had been in the victim's apartment that morning from a photograph shown to him by police.

[Petitioner's] girlfriend testified that in the early evening of July 10, she had been with [Petitioner] in a park in Attleboro, where she had fallen asleep. When she awoke around 8 P.M., [Petitioner] was gone. She called [Petitioner] several times between 8:15 P.M. and 9:09 P.M., including on cell phones borrowed from two strangers. Initially, she did not get an answer, but she eventually spoke to [Petitioner]. She then met up with [Petitioner] shortly after the 9:09 P.M. cell phone call. . . .

When officers discovered the victim's body at his residence, they also found the victim's cell phone. However, police were unable to extract any information from it because it was soaked. A neighbor provided the victim's cell phone number, and using that, [law enforcement] obtained the victim's call logs and other information from his service provider, Sprint. In the call logs, [law enforcement] focused on incoming and outgoing calls occurring shortly before 9 P.M., when witnesses reported hearing commotion coming from the victim's apartment. [Law enforcement] then made a second request to Sprint for information pertaining to two of those numbers pursuant to the

2

exigent circumstances provision of the Stored Communications Act (SCA), 18 U.S.C. § 2702(c)(4).

One of the numbers was registered to "Matthew Shady" and listed a West Warwick, Rhode Island, address.  In addition to that subscriber information, the records showed the dates, times, and durations of incoming and outgoing calls, as well as CSLI. Troopers called the local police department and learned that the West Warwick address was valid and that the resident was [Petitioner].  Local police had previously interacted with [Petitioner] and sent [law enforcement] a photograph of [Petitioner], as well as incident reports of some of his previous arrests. From these documents, [law enforcement] learned that [Petitioner] was blonde and muscular, and that he matched the description of the man that [Brian] Singer, a friend of the victim, had seen talking to the victim on the evening of July 10.  [Law enforcement] examined [Petitioner's] CSLI and determined that it placed his cell phone in the Attleboro area on the evening of July 10.

On July 11, [law enforcement] interviewed Singer, who had gone to the victim's apartment at around 8 P.M. on the day of the murder to sell the victim two packs of cigarettes, and who had stayed for about twenty minutes.  While Singer was there, the victim introduced him to a man named "Matt."  The man was muscular, with a crew cut, blonde hair, blue eyes, and tattoos.  Based on this information, law enforcement prepared a photographic array, including the photograph of [Petitioner] that the West Warwick police had sent.  From the array, Singer identified [Petitioner] as the blonde man he had seen in the victim's apartment.

Troopers then attempted to locate [Petitioner].  On [Petitioner's] call log, they noticed recent calls to a land line telephone number, and they subsequently ascertained the address associated with it.  On July 12, [law enforcement] visited that address and spoke with the occupant, [Ms. R]. [Ms. R] stated that her daughter was dating [Petitioner], and that [Petitioner] had left some of his property there and likely would return to retrieve it.

Later that day, [Ms. R] called the State police to say that she had just heard from her daughter and that she expected her daughter and [Petitioner] to return to the house shortly.  Troopers returned to [Ms. R's] address and waited for [Petitioner] to arrive.  As soon as he did, officers placed him under arrest.

SA 476–77.

## C.  Petitioner's Arrest and Trial Testimony

Before [Petitioner] was taken into custody, police patted him down and found a hypodermic needle in his pocket; testing later revealed traces

of heroin. While [Petitioner] was being booked, an officer noticed spots of blood on [Petitioner's] shoes. Deoxyribonucleic acid (DNA) testing revealed that the blood matched that of the victim. Two additional spots of blood found on a T-shirt and pack of cigarettes from [Petitioner's] backpack also matched that of the victim.

After his arrest, [Petitioner] waived his Miranda rights and was interviewed by police. That interview was recorded, and the recording was entered in evidence. [Petitioner] initially denied involvement, but he eventually said that he had gone to the victim's apartment on the evening of July 10 to buy heroin. He told police that two other men were present while he was there. The first man arrived to sell the victim cigarettes and stayed ten to fifteen minutes. [Petitioner] described the second man but could not identify him, and said that the second man was still at the apartment when [Petitioner] left. [Petitioner] stated that he left the apartment after purchasing drugs. He explained that he had initially lied about visiting the victim because he had been there to purchase drugs, and because he later heard about the fire and homicide from the news.

At trial, [Petitioner] testified and provided a somewhat different account of his time at the victim's apartment. He identified the cigarette seller as a man named Brian Singer. He stated that after Singer had left and while the second, unidentified, man was in the apartment, the victim brandished a knife and provoked a fight with [Petitioner] over money that [Petitioner] owed him. [Petitioner] said he struck the victim several times in the face, and the victim dropped the knife. He then grabbed his backpack and left. [Petitioner] stated that in his initial interview after being arrested, he had lied about getting in a fight because he had seen the news and had heard that there had been a fire and a homicide there.

SA 476–77.

## II. PROCEDURAL HISTORY

On October 31, 2014, following a nine-day trial in the Bristol County Superior Court, a jury found Petitioner guilty of murder in the first degree by extreme atrocity or cruelty, and he was sentenced to life without parole.[1]  SA 18.  Petitioner subsequently

---

[1] Several months prior to this trial, an earlier June-July 2014 trial ended in a mistrial when the jury could not agree on a verdict. SA 13–14.

filed a motion for new trial on January 30, 2015, which the trial court denied on March 9, 2015, following a February 12, 2015 evidentiary hearing.[2]  *Id.* at 19.

On January 11, 2019, Petitioner's direct appeal was entered in the SJC.[3]  SA 23. On May 4, 2021, the SJC affirmed Petitioner's conviction, refusing "to order a new trial or to reduce the degree of guilt."  *Id.* at 484.  On May 18, 2021, Petitioner filed a timely motion for reconsideration, which the SJC denied on July 2, 2021.  *Id.* at 24, 488.

On September 29, 2022, Petitioner filed the instant petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  ECF No. 1.  On December 19, 2022, Petitioner filed his opening brief, ECF No. 19,[4] which Respondent answered on February 13, 2023.  ECF 20.  Respondent thereafter filed her opposition brief on May 14, 2023, ECF No. 24, which she subsequently revised and re-filed on May 21, 2025, pursuant to this Court's order, ECF No. 29.[5]  Plaintiff filed a reply on August 23, 2023.  ECF No. 25.

---

[2] Petitioner did not appeal the trial court's denial of his motion for a new trial.  ECF No. 19 at 2.

[3] "According to the scheme set forth in [Mass. Gen. Laws ch. 278, § 33E], a defendant who has been convicted of first-degree murder is afforded plenary review on direct appeal to the SJC."  *Lee v. Corsini*, 777 F.3d 46, 55 (1st Cir. 2015).

[4] Petitioner failed to include page numbers in his thirty-page brief.  *See* ECF No. 19.  The Court has utilized the ECF stamped page numbers in citing to Petitioner's opening brief.

[5] Respondent revised the citations in its opposition brief in accordance with the Court's May 13, 2025 order.  *See* ECF No. 28. The Court relies on the revised brief at ECF No. 29.

## III.    Standard of Review

### A.  Entitlement to Federal Habeas Relief

Under the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"),

when a claim has previously been adjudicated on the merits by a state court, a petitioner

may only obtain habeas relief if that adjudication:

> (1) resulted in a decision that was contrary to, or involved an
> unreasonable application of, clearly established Federal law, as
> determined by the Supreme Court of the United States; or (2) resulted
> in a decision that was based on an unreasonable determination of the
> facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *see also Brown v. Davenport*, 596 U.S. 118, 127 (2022).

To obtain habeas relief, "a state prisoner must show that the state court's ruling on

the claim being presented in federal court was so lacking in justification that there was an

error well understood and comprehended in existing law beyond any possibility for

fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011). "The

petitioner carries the burden of proof." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011)

(citing *Woodford v. Visciotti*, 537 U.S. 19, 25 (2002)).

"[H]abeas corpus is a 'guard against extreme malfunctions in the state criminal

justice systems,' not a substitute for ordinary error correction through appeal."

*Harrington*, 562 U.S. at 102–03 (quoting *Jackson v. Virginia*, 443 U.S. 307, 332 n.5

(1979) (Stevens, J., concurring)). "'[T]he gap between erroneous state court decisions and

unreasonable ones is narrow,' and 'it will be the rare case that will fall into this gap.'"

*O'Laughlin v. O'Brien*, 568 F.3d 287, 299 (1st Cir. 2009) (quoting *Evans v. Thompson*,

518 F.3d 1, 6 (1st Cir. 2008)).

1.  <u>Clearly Established Federal Law</u>

"In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 68 (1991).  "Errors based on violations of state law are not within the reach of federal habeas petitions unless there is a federal constitutional claim raised." *Kater v. Maloney*, 459 F.3d 56, 61 (1st Cir. 2006) (citing *Estelle*, 502 U.S. at 67–68).  Only Supreme Court decisions constitute clearly established federal law for habeas purposes. *See Brown v. Davenport*, 596 U.S. at 136; *Parker v. Matthews*, 567 U.S. 37, 48–49 (2012) (per curiam) ("[C]ircuit precedent does not constitute 'clearly established Federal law, as determined by the Supreme Court[.]' It therefore cannot form the basis for habeas relief under AEDPA." (citation omitted)).  Moreover, the court will "not set aside state court rulings on habeas review for being at odds with Supreme Court dicta."  *Hardy v. Maloney*, 909 F.3d 494, 500 (1st Cir. 2018) (citing *Woods v. Donald*, 575 U.S. 312, 316 (2015)).

2.  <u>"Contrary to" Clearly Established Federal Law</u>

A state court decision is "contrary to" clearly established Supreme Court precedent if: (1) "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law;" or (2) the state court decides a case differently from a decision of the Supreme Court on a materially indistinguishable set of facts. *Williams v. Taylor*, 529 U.S. 362, 405, 413 (2000) (O'Connor, J., concurring).

3.  <u>Unreasonable Application of Clearly Established Law</u>

By contrast, a state court unreasonably applies federal law when it

> correctly identifies the governing legal principles, but (i) applies those
> principles to the facts of the case in an objectively unreasonable
> manner; (ii) unreasonably extends clearly established legal principles
> to a new context where they should not apply; or (iii) unreasonably

refuses to extend established principles to a new context where they
should apply.

*Gomes v. Brady*, 564 F.3d 532, 537 (1st Cir. 2009) (quoting *Sleeper v. Spencer*, 510 F.3d
32, 38 (1st Cir. 2007)).  The unreasonable application clause "affords relief 'if, and only if,
it is so obvious that a clearly established rule applies to a given set of facts that there could
be no fairminded disagreement on the question.'"  *Webster v. Gray*, 39 F.4th 27, 34 (1st
Cir. 2022) (quoting *White v. Woodall*, 572 U.S. 415, 427 (2014)).  In other words, to
warrant relief, "the state court's application of Supreme Court precedent 'must be
objectively unreasonable, not merely wrong; even clear error will not suffice.'"  *Id.*
(quoting *White*, 572 U.S. at 419); *Field v. Hallett*, 37 F.4th 8, 16 (1st Cir. 2022) ("Even
where a state court has misapplied federal law, we will only grant relief to the petitioner
'in cases in which all fairminded jurists would agree that a final state court decision is at
odds with the Supreme Court's existing precedents.'" (quoting *Strickland v. Goguen*, 3
F.4th 45, 53 (1st Cir. 2021))).  "'[T]he more general the [federal] rule[,] . . .  the more
leeway [state] courts have in reaching outcomes in case-by-case determinations' before
their decisions can be fairly labeled unreasonable."  *Brown v. Davenport*, 596 U.S. at 144
(alterations in original) (quoting *Renico v. Lett*, 559 U.S. 766, 776 (2010)).

4.  Unreasonable Determination of Facts

An alternative to § 2254(d)(1), § 2254(d)(2) requires Petitioner to show that the
state court's decision on the merits "was based on an unreasonable determination of the
facts in light of the evidence presented in the State court proceeding."[6]  An "unreasonable

_____

[6] Relatedly, § 2254(e)(1) provides that "a determination of a factual issue made by
a State court shall be presumed to be correct" unless rebutted "by clear and
convincing evidence."  The Supreme Court and the First Circuit, however, have
both left open "the question of how §§ 2254(d)(2) and (e)(1) fit together."  *See*

determination of the facts" under 28 U.S.C. § 2254(d)(2) is a "demanding showing."

*Porter v. Coyne-Fague*, 35 F.4th 68, 75 (1st Cir. 2022).  The Court "may not characterize .

. . state-court factual determinations as unreasonable 'merely because [the Court] would

have reached a different conclusion in the first instance.'"  *Brumfield v. Cain*, 576 U.S.

305, 313–14 (2015) (quoting *Wood v. Allen*, 558 U.S. 290, 301 (2010)).  Section

2254(d)(2) "requires that [the Court] accord the state trial court substantial deference." *Id.*

at 314.  "[E]ven if '[r]easonable minds reviewing the record might disagree' about the

finding in question, 'on habeas review that does not suffice to supersede the trial

court's . . . determination.'"  *Wood*, 558 U.S. at 301 (quoting *Rice v. Collins*, 546 U.S. 333,

341–42 (2006)).

　　However, a federal habeas court's deference to a state court's reasonable

determination of facts under § 2254(d)(2) "does not imply abandonment or abdication of

judicial review."  *See Porter*, 35 F.4th at 75, 79–81 (quoting *Brumfield*, 476 U.S. at 314)

(holding that state court's finding regarding prosecutor's race-neutral reason for striking

prospective jury constituted an unreasonable determination of the facts).

---

*Porter v. Coyne-Fague*, 35 F.4th 68, 79 (1st Cir. 2022) (quoting *Wood*, 558 U.S. at 300) (noting that both provisions "seem to address essentially the same scenario"). This Court need not answer the question because, as discussed in more detail below, the claims before this Court constitute mixed questions of law and fact, which are addressed pursuant to § 2254(d)(1)—not § 2254(d)(2).  *See Yeboah-Sefah*, 556 F.3d at 70; *see also Rivera v. Kelly,* 763 F. Supp. 3d 105, 112 n.5 (D. Mass. 2025) (declining to decide issue because, "as in *Porter*, 'all roads lead to Rome: the outcome of [the Court's] inquiry would be the same whether [the petitioner] only has to show that the state court decision was based on an unreasonable determination of the facts, 28 U.S.C. § 2254(d)(2), or whether he also has to satisfy subsection (e)(1)'s clear and convincing standard'").

B.   *Brecht Prejudice Test*

Finally, "a federal court cannot grant relief [in a § 2254 habeas case] without first applying both the [prejudice] test [the Supreme] Court outlined in *Brecht* and the one Congress prescribed in AEDPA." *Brown v. Davenport*, 596 U.S. at 122; *see also St. Jean v. Marchilli*, 116 F.4th 71, 79 (1st Cir. 2024) ("Even if we determine that a state court's decision involves an unreasonable application of clearly established federal law under AEDPA, 'habeas relief will not follow automatically.'" (quoting *Foxworth v. St. Amand*, 570 F.3d 414, 425 (1st Cir. 2009))).  "[S]atisfying Brecht is only a necessary, not a sufficient, condition to relief.  AEDPA too must be satisfied." *Brown v. Davenport*, 596 U.S. at 127.

Under the *Brecht* test, a habeas petitioner is not entitled to relief unless the instructional error "'had substantial and injurious effect or influence in determining the jury's verdict.'" *Brecht v. Ambrahmson*, 507 U.S. 619, 623 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)).  In other words, state prisoners seeking federal habeas relief may obtain plenary review of constitutional claims of trial error, but are not entitled to habeas relief unless the error resulted in "actual prejudice." *Id.* at 637 (quoting *United States v. Lane*, 474 U.S. 438, 449 (1986)); *see, e.g.*, *Coleman v. Calderon*, 210 F.3d 1047, 1051 (9th Cir. 2000) (finding *Brecht* error where "[a]t the very least, we 'cannot say with fair assurance . . . that the judgment was not substantially swayed by the [instructional] error.'").

The proper question in assessing harm under *Brecht* is, "Do I, the judge, think that the error substantially influenced the jury's decision?" *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995).  If the court is convinced that the error did not influence the jury, or had but

very slight effect, the verdict and the judgment should stand. *See id.* at 437. If, on the other hand, the court is not fairly assured that there was no effect on the verdict, it must reverse. *See id.* at 437–38. In the "narrow circumstance" in which the court is in "grave doubt" about whether the error had substantial and injurious effect or influence in determining the jury's verdict, it must assume that the error is not harmless and the petitioner must win. *Id.* at 437–44 (relief granted because record so evenly balanced that conscientious judge in grave doubt as to harmlessness of error).

"In sum, where AEDPA asks whether *every* fairminded jurist would agree that an error was prejudicial, *Brecht* asks only whether a federal habeas court *itself* harbors grave doubt about the petitioner's verdict." *Brown v. Davenport*, 596 U.S. at 136. As such, the *Brecht* standard reflects the view that a "State is not to be put to th[e] arduous task [of retrying a defendant] based on mere speculation that the defendant was prejudiced by trial error; the court must find that the defendant was actually prejudiced by the error." *Calderon v. Coleman*, 525 U.S. 141, 146 (1998) (per curiam).

Moreover, where the state court has applied the correct standard and determined that an error was harmless beyond a reasonable doubt, "a federal court may not award habeas relief under § 2254 unless the [*Brecht*] harmlessness determination itself was unreasonable." *Davis v. Ayala*, 576 U.S. 257, 269 (2015) (emphasis omitted) (quoting *Fry v. Pliler*, 551 U.S. 112, 119 (2007)); *see also Martinez v. Alves*, No. 23-cv-10285, 2024 WL 4355120, at *13 (D. Mass. July 25, 2024), *report and recommendation adopted*, No. 23-cv-10285, 2024 WL 4349239 (D. Mass. Sept. 30, 2024).

## IV.    Issues

Petitioner raises four claims for federal habeas relief, including two claims with several sub-parts, all of which challenge his counsel's failure to object to seven jury instructions and a hypothetical.  Specifically, Petitioner contends:

(1)    that he received ineffective assistance from state court trial counsel when counsel failed to object to a jury instruction that he contends required the jury to find irrelevant facts and that improperly required him to prove his own innocence, ECF No. 19 at 16–20;

(2)    that he received ineffective assistance of counsel when his trial counsel failed to object to jury instructions and a hypothetical regarding direct and circumstantial evidence, where:[7]

> (a) the hypothetical "acted as a roadmap as to how the jury could put together [a] chain of circumstantial evidence" to find him guilty, SA 75, ECF No. 19 at 25 (arguing that the hypothetical "detailed a crime" that "mirrored the circumstances of [Petitioner's] case" instructing "how a jury could use a chain of inferences to solve this crime");
>
> (b) the judge's follow-up instruction regarding the role of logic and common sense in drawing reasonable inferences improperly advised the jury that "any inference they might draw of [Petitioner's] guilt would be 'a

---

[7] The Court notes that Petitioner's federal habeas brief—unlike his brief before the SJC and unlike the SJC's decision—combined all three of these sub-issues into one single claim.  ECF No. 19 at 24–26.  For clarity, the Court separates out in this order the distinct sub-issues as adjudicated by the SJC because even though they have currently been combined into one single section by Petitioner in his federal habeas brief, they remain three separate sub-issues.

reasonable one,'" SA 77, ECF No. 19 at 25 (arguing that instruction advised "jury precisely how to use a chain of inferences to convict [Petitioner]");

(c) the judge's additional instruction regarding the "rules" for drawing reasonable inferences relieved the government of its duty to prove all elements *except* for the intent element beyond a reasonable doubt, SA 78–79;

(3)    that he received ineffective assistance from trial counsel when counsel failed to object to three jury instructions "regarding witness credibility" that he contends effectively deprived him of his right to testify on his own behalf and put on a defense, including

(a) an instruction regarding bias that he contends diluted the presumption of innocence, ECF No. 19 at 20–22;

(b) an instruction regarding contradictions between exhibits and witnesses that he claims improperly required the jury to discount his testimony to the extent that it was contradicted by his interview with law enforcement, ECF No. 19 at 22–23; and

(c) an instruction regarding the jury's understanding of a video recording from his interview with law enforcement, ECF No. 19 at 23–24; and

(4)    that the cumulative effect of the erroneous jury instructions violated his due process rights.

## V.    DISCUSSION

### A.  Nature of Petitioner's Federal Habeas Claims

#### 1.  SJC Proceedings

On direct appeal before the SJC, Petitioner, who was represented by the same counsel as in these federal habeas proceedings, argued that the above-challenged jury instructions violated his due process rights, his right to present evidence and testify on his own behalf, and his right to have the jury decide beyond a reasonable doubt the facts necessary to constitute the crime(s), as guaranteed by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.  SA 63–65.  Additionally, Petitioner argued that his counsel's failure to object to the challenged instructions violated his Sixth Amendment right to effective assistance of counsel ("IAC") under *Strickland v. Washington*, 466 U.S. 668 (1984).  SA 60–61 (Petitioner's opening brief to SJC); SA 362 (Commonwealth's opposition brief to SJC noting that Petitioner additionally challenged his trial counsel's failure to object to the instructions as ineffective assistance of counsel). In support of both his instructional and IAC claims before the SJC, Petitioner argued that there were two issues in controversy at trial:  (1) his credibility; and (2) "whether the Commonwealth's circumstantial case against [him] had been prove[n] beyond a reasonable doubt."  SA 83.  He contended that both the instructional errors and trial counsel's failure to object to the errors required a new trial given the "substantial likelihood of a miscarriage of justice."  *Id*.  However, after setting forth the issues, in his opening brief before the SJC, Petitioner primarily developed the issues as jury instruction errors as opposed to errors related to his counsel's performance.  *See id.* at 65–79.

In opposition before the SJC, the Commonwealth acknowledged that Petitioner had raised both IAC and instructional error, but noted that because Petitioner did not object to the jury instructions before the trial court, the SJC was required to evaluate both the IAC and instructional claims under the same state law standard of review: "whether the [unpreserved error] created a substantial likelihood of a miscarriage of justice." SA 361–62 (first quoting *Commonwealth v. Richards*, 153 N.E.3d 1226, 1252 (Mass. 2020); and then citing *Commonwealth v. Wright*, 584 N.E.2d 621 (Mass. 1992)).[8]

The Commonwealth then argued before the SJC that any errors—or combination of errors—failed to satisfy the standard requiring a "substantial likelihood of a miscarriage of justice." SA 380–81. It contended that, to the extent there were errors, Petitioner was not prejudiced because "[t]he circumstantial evidence, including the discovery of [the victim's] blood on [Petitioner's] shoes and on a pack of cigarettes in [Petitioner's] backpack, supported the jury's conclusion that [he] was, in fact, guilty." *Id.* at 380–81. It further argued that evidence regarding the "manner of killing"—which included evidence that Petitioner "beat, strangled, and stabbed" the victim with "two different weapons" and then "attempted to set the apartment on fire"—justified the jury's conclusion that Petitioner acted with extreme atrocity or cruelty. *Id.* at 380.

---

[8] As discussed in more detail below, the First Circuit has held that this state law standard is at least equivalent to—and likely more favorable to Petitioner—than the prejudice standard under *Strickland*. *See Knight v. Spencer*, 447 F.3d 6, 15 (1st Cir. 2006); *Mello v. DiPaulo*, 295 F.3d 137, 144 (1st Cir. 2002). Thus, if a Petitioner is unable to satisfy the Commonwealth standard, the Petitioner is also unable to satisfy the *Strickland* standard. *See Mello*, 295 F.3d at 144.

2.  SJC Decision

While not entirely clear in places, the SJC appears to have decided Petitioner's claims on both instructional grounds and on IAC grounds.[9]  SA 471–87.  In particular, the SJC decisively found instructional error with one of the trial judge's challenged instructions, namely the instruction and hypothetical regarding direct and circumstantial evidence.  *Id.* at 482–83.  As for the remaining six challenged instructions, the SJC suggested there was no instructional error as to five of the instructions and did not clearly address the existence of error regarding the sixth challenged instruction (regarding the "rules" for drawing reasonable inferences), noting only that it "[did] not think [the sixth instruction] created a substantial likelihood of a miscarriage of justice."  *Id.* at 480–84.

The SJC additionally determined that Petitioner's trial counsel was ineffective in failing to object to the erroneous hypothetical/instruction regarding direct and circumstantial evidence.  SA 483.  It did not, however, explicitly address any deficiencies in counsel's performance as to the other six challenged instructions, but, presumably, having found no instructional error, it also found no deficiency.

The SJC concluded that none of Petitioner's alleged instructional or IAC errors "create[d] a substantial likelihood of a miscarriage of justice."  SA 480.  This included the trial judge's hypothetical/instruction for which the SJC found both instructional error and deficient performance.  *Id.* at 483.

---

[9] The SJC characterized Plaintiff as having argued that multiple "aspects of the jury instructions were erroneous."  SA 476.  In subsequently addressing the specific instructions, however, the SJC noted only that Petitioner "argue[d] that his counsel was ineffective for failing to object to . . . portions of the jury instructions, and that the failure to object created a substantial likelihood of a miscarriage of justice."  *Id.* at 480.

3.  <u>Federal Habeas Claims</u>

Petitioner's federal habeas petition, in contrast to his SJC direct appeal, appears to state federal habeas claims based solely on his trial counsel's ineffective assistance in failing to object to the challenged instructions.  ECF No. 19 at 15 (federal habeas brief) ("The state court decision that trial counsel was not ineffective for failing to object to a series of incorrect and highly prejudicial jury instructions was, in part, contrary to clearly established federal law as determined by the United States Supreme Court, and otherwise was an unreasonable application of such clearly established law and was based on multiple unreasonable determination of facts in light jury instructions and the case as a whole."); *cf.* SA 60 (Petitioner's SJC opening brief) ("Where the trial court's instructions to the jury . . . were riddled with prejudicial errors and, looked at in their entirety, served to deny the defendant his fundamental rights to due process of law and [to a] trial before an impartial jury, his right to testify in his own defense and to present evidence on his own behalf, and his rights to demand that the Commonwealth prove every element of the crime beyond a reasonable doubt, counsel's failure to object to those errors, require that his conviction be reversed and he be granted a new trial.").  Petitioner's subsequent discussion of his federal habeas claims is, however, framed largely as arguments regarding the underlying instructional errors.  *See* ECF No. 19 at 15–28.

Respondent notes the confusion, stating that "[a]s a preliminary matter, the petitioner's argument here appears to be a claim about instructional error rather than ineffective assistance of counsel."  ECF No. 29 at 29.  Respondent then suggests that Petitioner's federal habeas claims should be limited to the ineffective assistance of counsel claims.  *Id.* ("To be clear, the question before this Court is whether the SJC reasonably

rejected the petitioner's ineffective assistance of counsel claims under *Strickland*.  It is not about instructional error.").

Subsequently, in reply, Petitioner "agrees with . . . Respondent that, at bottom, this case is not about instructional error, but 'whether the SJC reasonably rejected the petitioner's [IAC] claims under *Strickland*.'"  ECF No. 25 at 3.  Petitioner explains, though, that "it was necessary for [him] in his [opening brief] to explain in detail precisely how the errors in the jury instructions worked, both on their own and in conjunction with each other, to (1) prevent the jury from fully and fairly considering [his] case, as presented by trial counsel, and (2) deny him his due process rights to a fair trial."  *Id.*

Based on Petitioner's clarification in his reply regarding the nature of the claims that he is raising before this Court in the instant petition, the Court adjudicates the alleged instructional errors only in light of and as necessary to resolve Petitioner's related IAC claims.

### B.  Claim-Specific Habeas Legal Standards

#### 1.  Jury Instruction Claims

Jury instructions are generally matters of state law for which federal habeas relief is not available, except insofar as an instructional error implicates the fundamental fairness of a trial in violation of due process or infringes upon another enumerated federal constitutional right.  *See Waddington v. Sarausad*, 555 U.S. 179, 190–91 (2009); *Estelle*, 502 U.S. at 67–68 ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.  In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of

the United States."); *see also Niziolek v. Ashe*, 694 F.2d 282, 290 (1st Cir. 1982) ("As a general rule, improper jury instructions will not form the basis for federal habeas relief.").

Federal habeas relief based on instructional error requires a petitioner to "establish[] not merely that the instruction is undesirable, erroneous or even 'universally condemned,' but that it violated some constitutional right," and that "the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *Estelle*, 502 U.S. at 72 (first quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974); and then quoting *Cupp v. Naughten*, 414 U.S. 141, 146–47 (1973)).

A petitioner must make two showings: (1) that the instruction was ambiguous and there is "a reasonable likelihood" that the jury applied it in a way that violates the Constitution, *Estelle*, 502 U.S. at 72 (quoting *Boyde v. California*, 494 U.S. 370, 380 (1990)); and (2) that the instruction "had substantial and injurious effect or influence in determining the jury's verdict," *Brecht*, 507 U.S. at 637 (citation omitted).[10]  These are two separate tests or standards.  *See Calderon*, 525 U.S. at 146 (discussing differences in

---

[10] At least one circuit—the Ninth Circuit—has definitively held that a federal habeas court is not required to use the "reasonable likelihood" standard employed for ambiguous jury instructions "when the disputed instruction is erroneous on its face."  *See Wade v. Calderon*, 29 F.3d 1312, 1321 (9th Cir. 1994) (citing *Walton v. Arizona*, 497 U.S. 639, 653 (1990)), *overruled on other grounds by Rohan ex rel. Gates v. Woodford*, 334 F.3d 803, 815 (9th Cir. 2003); *Ho v. Carey*, 332 F.3d 587, 592 (9th Cir. 2003).   Instead, in cases of clearly erroneous instructions, "the reviewing court should skip any 'reasonable likelihood' analysis and proceed immediately to determination of whether the clearly erroneous instruction requires reversal under the applicable prejudice standard."  *Murtishaw v. Woodford*, 255 F.3d 926, 968 (9th Cir. 2001) (holding that "to establish that a jury instruction was clearly erroneous rather than ambiguous, one must show that the jury was instructed that it could convict based on legally impermissible grounds"); *see also* 75A Am. Jur. 2d Trial § 872 (2025) ("To establish that a jury instruction is clearly erroneous, rather than ambiguous, a petitioner must show that the jury was instructed that it could convict based on legally impermissible grounds.").

"reasonable likelihood" test and *Brecht* prejudice test, and holding that the "reasonable likelihood" test is "not a harmless-error [or prejudice] test at all," but "is, rather, the test for determining, in the first instance, whether constitutional error occurred"); *see also Ho v. Carey*, 332 F.3d 587, 592 (9th Cir. 2003) ("[W]hen considering an allegedly erroneous jury instruction in a habeas proceeding, an appellate court first considers whether the error in the challenged instruction, if any, amounted to 'constitutional error.' If so, the court then considers whether the error was harmless." (quoting *Morris v. Woodford*, 273 F.3d 826, 933 (9th Cir. 2001))).

### i.   First Test:  Instructional Error

The first test "does not inquire into the actual effect of the error on the jury's verdict; it merely asks whether constitutional error has occurred." *Calderon*, 525 U.S. at 147.  "In making this determination, the jury instruction 'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record." *Waddington*, 555 U.S. at 191 (quoting *Estelle*, 502 U.S. at 72); *see also Cupp*, 414 U.S. at 147.  A petitioner "must show both that the instruction was ambiguous and that there was 'a reasonable likelihood' that the jury applied the instruction in a way" that violates the Constitution. *See Waddington*, 555 U.S. at 190–91 (quoting *Estelle*, 502 U.S. at 72).

### ii.  Second Test:  Prejudice

Instructional error alone is not sufficient, and habeas relief will be granted only if the petitioner can establish that the error had a substantial and injurious effect or influence in determining the jury's verdict under *Brecht*. *See Hedgpeth v. Pulido*, 555 U.S. 57, 61 (2008) (per curiam) (holding that instructional errors that do not "categorically 'vitiat[e]

20

all the jury's findings'" are subject to harmless error analysis).  In other words, a petitioner

is required to show that that the instructional error "resulted in 'actual prejudice.'" *Brecht*,

507 U.S. at 637 (citation omitted).

### 2.  Ineffective Assistance of Counsel Claims

#### i.  *Strickland* Standard Generally

Under *Strickland*, "[t]o succeed in his claim of ineffective assistance of counsel,

[Petitioner] 'must show both deficient performance by counsel and resulting prejudice.'"

*Quintanilla v. Marchilli*, 86 F.4th 1, 17 (1st Cir. 2023) (quoting *Thompson v. United States*,

64 F.4th 412, 421 (1st Cir. 2023)); *see Strickland*, 466 U.S. at 687.  "'[B]oth the

[deficiency] and prejudice components of the ineffectiveness inquiry are mixed questions

of law and fact,' rather than pure factual determinations."  *Quintanilla*, 86 F.4th at 18

(quoting *Strickland*, 466 U.S. at 698).  Accordingly, as "a mixed question of law and

fact . . . , it is evaluated under the 'unreasonable application' clause of § 2254(d)."

*Yeboah-Sefah*, 556 F.3d at 70 (quoting *Williams*, 529 U.S. at 409).

#### a.  Deficient Performance

In order to show "'that counsel's performance was deficient, a defendant must

show that it fell below an objective standard of reasonableness under the circumstances.'"

*Yeboah-Sefah*, 556 F.3d at 70 (quoting *Sleeper*, 510 F.3d at 38); *Quintanilla*, 86 F.4th at

17.  In its analysis of counsel's performance, a court is required to "apply a 'strong

presumption' that counsel's representation was within the 'wide range' of reasonable

professional assistance."  *Harrington*, 562 U.S. at 104 (quoting *Strickland*, 466 U.S at

689).  "The inquiry is objective: '*Strickland* . . . calls for an inquiry into the objective

reasonableness of counsel's performance, not counsel's subjective state of mind.'"

*Quintanilla*, 86 F.4th at 18 (quoting *Harrington*, 562 U.S. at 110).

*b.* Prejudice

To show *Strickland* prejudice,

> [Petitioner] must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."

*Harrington*, 562 U.S. at 104 (quoting *Strickland*, 466 U.S. at 694, 693).  "[S]how[ing] that

the errors had some conceivable effect on the outcome of the proceeding" is insufficient;

instead, Petitioner must establish that the errors were "so serious as to [have] deprive[d]

[him] of a fair trial, a trial whose result is reliable."  *Id.* (quoting *Strickland*, 466 U.S. at

687, 693).  While this standard "does not require a showing that counsel's actions 'more

likely than not altered the outcome,' . . . [t]he likelihood of a different result must be

substantial, not just conceivable."  *Id.* at 111–12 (quoting *Strickland*, 466 U.S. at 693).

ii.  Application of *Strickland* Standards in AEDPA Case

When, like here, the Court is required to superimpose AEDPA's deferential

standard on top of *Strickland's* existing "highly deferential" standard, the resulting federal

habeas standard for analyzing an IAC claim is "doubly" deferential.  *Harrington*, 562 U.S.

at 105 (first quoting *Strickland*, 466 U.S. at 105; and then quoting *Knowles v. Mirzayance*,

556 U.S. 111, 123 (2009)); *see also Quintanilla,* 86 F.4th at 18 (discussing double

deference standard).  Accordingly, "the 'pivotal question' in a federal collateral attack

under *Strickland* is not 'whether defense counsel's performance fell below *Strickland*'s

standard,' but 'whether the state court's application of the *Strickland* standard was

unreasonable,'. . . that is, whether 'fairminded jurists' would all agree that the decision

22

was unreasonable." *Jewett v. Brady*, 634 F.3d 67, 75 (1st Cir. 2011) (quoting *Harrington*, 562 U.S. at 101–02); *see also Harrington*, 562 U.S. at 105 ("When § 2254(d)(1) applies, the question is not whether counsel's actions were reasonable" but "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard."); *see also Field*, 37 F.4th at 18–19 ("Whether the SJC applied *Strickland* unreasonably is not the same as asking whether defense counsel's performance fell below *Strickland*'s standard."). The deferential standard makes the trial counsel's strategic and tactical decisions "virtually unchallengeable." *Field*, 37 F.4th at 20 (quoting *Strickland*, 466 U.S. at 690).

### C. Petitioner's Individual IAC Claims

#### 1. Analysis of "Hybrid" IAC/Instructional Claims

The Court will adjudicate Petitioner's claims as IAC claims given Petitioner's clarification regarding their nature in his reply brief, as discussed above. In doing so, the Court follows an approach similar to that utilized by the First Circuit in *Mello*, which also involved "hybrid claims," or IAC claims that "refer[] back" to other claims, including instructional errors. 295 F.3d at 144. In *Mello*, in adjudicating the petitioner's hybrid federal habeas IAC claims based on instructional errors, the First Circuit considered the SJC's resolution of related jury instruction claims to the extent that such resolution informed the bases for the *Mello* petitioner's related IAC claims. *See id.* at 148–49.

At the outset, first, though, the Court notes that the SJC here did not explicitly state that it was evaluating Petitioner's IAC claims under *Strickland*. Instead, the SJC evaluated both the instructional and IAC claims under Massachusetts General Laws chapter 278, § 33E. As noted, that statute affords plenary review to first-degree murder convictions, asking whether there was a "substantial likelihood of a miscarriage of justice"

in the trial. *See Wright*, 584 N.E.2d at 624; *Commonwealth v. Wright*, 14 N.E.3d 294, 309

n.28 (Mass. 2014); *see also Mello*, 295 F.3d at 144. Under this state law standard, the

state court "determine[s] whether defense counsel erred in the course of the trial and, if so,

'whether that error was likely to have influenced the jury's conclusion.'" *Commonwealth*

*v. Seino*, 96 N.E.3d 149, 159 (Mass. 2018) (quoting *Wright*, 548 N.E.2d at 624) (noting

that "[u]nder this standard, the defendant bears the burden of demonstrating both error and

harm").

      The First Circuit has "recognized[, though,] that adjudication of a constitutional

claim on its merits encompasses situations in which a petitioner's claim was resolved

under a state standard 'that is more favorable to defendants than the federal standard.'"

*Zuluaga v. Spencer*, 585 F.3d 27, 30 (1st Cir. 2009) (quoting *McCambridge v. Hall*, 303

F.3d 24, 35 (1st Cir. 2002), and citing *Norton v. Spencer*, 351 F.3d 1, 5 (1st Cir. 2003))

(noting that in *Norton*, the state court had cited only state law, but because that state law

was more generous to defendants than corresponding federal law, the First Circuit held

that the subsumed federal claims had been addressed on the merits). In particular, the First

Circuit has held that section 33E's "substantial likelihood of a miscarriage of justice"

standard, as applied by the SJC here, is "more favorable to [a] defendant than the federal

constitutional standard articulated by the Supreme Court in *Strickland*." *Knight*, 447 F.3d

at 10–11 (citing *Wright*, 584 N.E.2d at 624); *see also Mello*, 295 F.3d at 144–52 (holding

that even though some of the state trial court's instructions may have been erroneous, the

SJC's conclusion that the challenged jury instructions "did not create a substantial

likelihood of a miscarriage of justice" was not "objectively unreasonable," such that the

petitioner was not entitled to federal habeas relief on his IAC-related claims, noting that state law standard was more favorable to the petitioner than the *Strickland* standard).

Accordingly, the First Circuit has directed this Court to "presume the federal law adjudication to be subsumed within the state law adjudication," such that the SJC's section 33E analysis here is deemed "on the merits" for purposes of *Strickland*.  *Yeoboah-Sefah*, 556 F.3d at 70 n.7 (quoting *Sleeper*, 510 F.3d at 39); *Harrington*, 562 U.S. at 99 ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."); *see also Walker v. Medeiros*, 911 F.3d 629, 636 (1st Cir. 2018) (holding that "[t]he 'miscarriage of justice' standard . . . subsumes both the *Strickland* test for determining constitutionally deficient performance by defense counsel and the *Strickland* test for determining whether such deficient performance was prejudicial").

Similar to *Mello*, in adjudicating each of Petitioner's federal habeas IAC claims, the Court here will consider the SJC's instructional error determination underlying its related IAC determination.

In doing so, the Court first considers, under the AEDPA, the SJC's determination regarding the existence of instructional error.  The SJC's instructional determinations are typically reviewed under § 2254(d)(1)'s "unreasonable application" clause.  *See Lucien v. Spencer*, 871 F.3d 117, 126 (1st Cir. 2017).  The Court thus ultimately asks if the SJC's determination as to whether there is "'a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution," *Estelle*, 502 U.S. at 72

(quoting *Boyde*, 494 U.S. at 380), constituted an unreasonable application of clearly established federal law.[11]

Second, based on its determination regarding instructional error, the Court asks whether the SJC's resolution of Petitioner's related ineffective assistance of counsel claim resulted in a decision that constituted an "unreasonable application of clearly established Federal law." 28 U.S.C. § 2254(d)(1). As noted, "the 'pivotal question' in a federal collateral attack under *Strickland* is not 'whether defense counsel's performance fell below *Strickland*'s standard,' but 'whether *the state court's application* of the *Strickland* standard was unreasonable,' . . . that is, whether 'fairminded jurists' would all agree that the decision was unreasonable." *Jewett*, 634 F.3d at 75 (emphasis added) (quoting *Harrington*, 562 U.S. at 101–02); *see also Yeboah*, 556 F.3d at 71 (noting that ultimate question is whether the SJC applied *Strickland* to the facts of petitioner's case in an objectively unreasonable manner (citing *Malone*, 536 F.3d at 63)). This applies to the state court's determination regarding both deficient performance and prejudice under *Strickland*. *See Harrington*, 562 U.S. at 104–06, 111–12.

This Court's analysis of the SJC's determination regarding the first *Strickland* prong—whether counsel's performance was deficient—is tied directly to its analysis of the SJC's determination regarding the existence of instructional error. *See, e.g.*, *Alves v.*

---

[11] As discussed in the legal standard section above, a petitioner is also required to show actual prejudice, i.e., that the instruction "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637 (citation omitted). However, because Petitioner has raised IAC claims based on the instructional errors, as discussed in more detail below, the Court need only address any prejudice associated with the IAC claims under *Strickland*.

*Matesanz*, 115 F. Supp. 2d 45, 56–57 (D. Mass. 2000) (noting in case involving similar hybrid-type IAC/instructional claims that state court's determination that the instruction underlying the petitioner's IAC claim was not erroneous under *Sandstrom v. Montana*, 442 U.S. 510, 512 (1979), constituted a rejection of the petitioner's ineffective assistance claim under the first prong of *Strickland*, "i.e., . . . [that] counsel acted reasonably in withholding any objection"). In other words, to the extent there is no federal constitutional instructional error, counsel's performance in failing to object to the instruction may not be considered deficient under *Strickland*.

Third and finally, the Court considers the SJC's determination regarding prejudice.[12]

As noted above, the prejudice associated with an instructional error under *Estelle* is evaluated under *Brecht*, while the prejudice associated with counsel's deficient performance is evaluated under *Strickland*. Given that Petitioner raises only "hybrid" IAC claims based on the underlying alleged instructional errors, the prejudice here required for his federal habeas IAC claims is that required by *Strickland* and *Harrington*. *See Mello*, 295 F.3d at 144. A separate analysis of *Brecht* prejudice is unnecessary when the Court addresses prejudice under *Strickland*. *See Kyles v. Whitley*, 514 U.S. 419, 436 (1995) (holding that "reasonable probability" of prejudice test under *Strickland* requires petitioners to make a greater showing of harm than the test enunciated in *Brecht*); *see also*

---

[12] While the Court is not technically required to reach both *Strickland* prongs, in most, if not all, of the claims below it has done so. *See Knight*, 447 F.3d at 15 ("A defendant's failure to satisfy one prong of the *Strickland* analysis obviates the need for a court to consider the remaining prong." (citing *Strickland*, 466 U.S. at 697)).

*Musladin v. Lamarque*, 555 F.3d 830, 834 (9th Cir. 2009) (holding that the *Strickland*

prejudice analysis is complete in itself, and there is no need for additional harmless error

review pursuant to *Brecht*); *Passos-Paternina v. United States*, 1999 WL 668522, at *1

(1st Cir. 1999) (unpublished table decision) (affirming district court decision applying

*Brecht* and noting that "the result would not change even if analyzed under the *Strickland*

standard").[13]

The Court thus addresses each of petitioner's ineffective assistance claims in turn

below according to the standards detailed above for hybrid IAC claims.

### 2. Instruction with Factual Questions for Jurors

Here, as in his appeal to the SJC, Petitioner argues that his trial counsel was

constitutionally deficient in failing to object to a jury instruction that he contends

unconstitutionally shifted the burden of proof to him.

### i. Relevant Jury Instructions

Prior to giving the jury the instruction challenged by Petitioner, the judge advised

the jury regarding the judge's role as follows:

> In working out your answers to those questions [regarding the evidence], you must observe the rules and definitions drawn from the law of this Commonwealth. The fate of this case must rest upon the

---

[13] The Court notes that Petitioner is mistaken in his assertion that he can show prejudice on his IAC claim by demonstrating *either* the *Strickland* standard for prejudice—a reasonable probability that the result of the proceeding would have been different—or by making the showing for instructional error under *Estelle*. *See* ECF No. 25 at 3 (citing *Estelle*, 502 U.S. at 72). As the Supreme Court explained in *Calderon*, satisfying the *Estelle* test for instructional error is not sufficient to show prejudice on a jury instruction claim; a separate *Brecht* analysis is necessary. *See* 525 U.S. at 146–47; *see also Waddington*, 555 U.S. at 191 ("[I]t is not enough that there is some 'slight possibility' that the jury misapplied the instruction." (citation omitted)). As noted above, the test for prejudice on an instructional claim is distinct from the *Estelle* test for instructional error cited by Petitioner.

> law of this state. My place in these proceedings is to report to you those
> legal rules and definitions which apply to this case. Because and only
> because my words represent the law, you must unconditionally accept
> and apply what I say. My best service to this jury is to help you, to act
> as an educator, to help you understand the law.

SA 297.

The judge subsequently advised the jury that he had decided in his cases "to give

more guidance to [the] jury in terms of the deliberative process," stating:

> I think after having been exposed to this process for a long time, having
> listened to people who have much to say, that this can help you, and
> I'm going to bring up suggestions. Not requirements. It's up to you.
> But you may be helped by those suggestions. So let us begin.

SA 300.

Thereafter, the judge instructed the jury as to the presumption of innocence,

advising them:

> You promised to honor the presumption under law that [Petitioner] is
> innocent and that he remains innocent unless and until believable
> evidence convinces each and every one of you of his guilt of a crime
> which is listed here beyond a reasonable doubt. That means that when
> that deliberation begins, you should pause and consciously,
> purposefully grant to him a state of innocence. You might even say it
> out loud. He's innocent at this point. And then recognize that his
> innocence can only be taken away if believable evidence convinces you
> all beyond a reasonable doubt of his guilt on each and every element of
> a crime charged.
>
> . . .
>
> The presumption of innocence teaches us that the defendant may rest
> inactive, and that it's solely the Commonwealth's responsibility to
> prove his guilt beyond a reasonable doubt. The presumption of
> innocence tells us who has to prove what. It teaches us that the
> Commonwealth has to prove it all. The defendant does not have to do
> a single thing.

SA 300–01.

The judge subsequently instructed the jury regarding the elements that the

Commonwealth was required to prove for both first and second degree murder, including

29

for murder in the first degree by extreme atrocity or cruelty—the charge on which
Petitioner was convicted.  SA 298–309.  The trial judge advised the jury that murder in the
first degree could "be proven by a theory or theories," and that it was "being asked to
deliberate upon three theories."  *Id.* at 298.  The judge noted, though, that although "[t]he
Commonwealth only has to prove one," the jury would "be asked to address all three
[theories]," which included "deliberate premeditation, extreme atrocity or cruelty, and
felony murder."  *Id.*; *see also id.* at 303 (noting that the Commonwealth "must prove"
Petitioner "guilty of first degree murder" in "one way").

The judge subsequently instructed the jury that it would need to find the following
two elements in order to find Petitioner guilty of murder in the first degree committed by
extreme atrocity or cruelty:  (1) Petitioner "committed an unlawful killing;" and (2) "the
killing was committed with an actual intent to kill [the victim], or . . . cause him grievous
bodily harm, or intended to do an act which, in the circumstances known to [Petitioner], a
reasonable person would have known created a plain and strong likelihood that death
would result."  SA 306–07.  The judge then reiterated that there were "three ways" the
Commonwealth could prove intent to kill with "extreme atrocity or cruelty," including:
"actual intent to kill [the victim]," "actual intent to cause [the victim] grievous bodily
harm," or a showing "that he intended to do an act which, in the circumstances known to
[Petitioner], a reasonable person would have known created a strong plain likelihood that
death would result."  *Id.* at 307.

In addition to the above two elements, the judge advised that the jury would need
to find a third element:  that the murder was committed "by extreme atrocity or cruelty."
SA 307.  The judge defined "extreme atrocity" as "an act that is extremely wicked, or

brutal, appalling, horrifying, or utterly revolting." *Id.* at 308. He defined "extreme

cruelty" as committing a killing "by a method that surpassed the cruelty inherent in any

taking of a human life." *Id.*

The judge then instructed the jury that it "must consider . . . the presence and

degree of the following [seven] factors:"

> One, whether [Petitioner] was indifferent to or took pleasure in the suffering of [the victim]. Two, the consciousness and degree of suffering of [the victim]. Three, the extent of injuries to [the victim]. Four, the number of blows to the victim. Five, the manner, degree, and severity of the force used. Six, the nature of the weapon, instrument[,] [o]r method used. And seven, the disproportion between the means needed to cause death and those employed. The seventh factor refers to whether the means used were excessive and out of proportion to what would be needed to kill a person.

SA 308–09. [14] The judge explained that the jury "[could] not make a finding of extreme

atrocity or cruelty unless it [was] based on one or more of the factors . . . listed," but that it

"need not be unanimous as to which particular factor or factors the Commonwealth has

proven beyond a reasonable doubt, so long as each juror is convinced beyond a reasonable

doubt that one or more of the factors . . . listed is present." *Id.* at 309.

------

[14] In a case decided after this case went to trial, the SJC clarified that these seven *Cunneen* factors, as listed above, which can satisfy the "extreme atrocity or cruelty" element, are not themselves "distinct elements or separate theories of culpability," but "are simply 'evidentiary considerations that guide the jury's determination as to whether the Commonwealth has proved beyond a reasonable doubt the element of a killing with extreme atrocity or cruelty.'" *Commonwealth v. Castillo*, 153 N.E.3d 1210, 1217–18 (Mass. 2020) (quoting *Commonwealth v. Kolenovic*, 84 N.E.3d 781, 793 (Mass. 2017)); *see also Commonwealth v. Cunneen*, 449 N.E.2d 658, 665 (Mass. 1983). Accordingly, a "jury d[oes] not need to be unanimous as to the particular *Cunneen* factor or factors they found; it suffices that each individual juror found beyond a reasonable doubt one of the Cunneen factors. . . . The jury need[] [only] be unanimous only in finding the required element that the killing was committed with extreme atrocity or cruelty." *Id.* (citation omitted).

In sum, the judge then reiterated the elements of the offense:

> If, after considering all the evidence, you conclude that the Commonwealth has proven beyond a reasonable doubt each of the following three elements I have just defined—number one, that [Petitioner] committed an unlawful killing; two, that the killing was committed with the required intent; and three, the killing was committed with extreme atrocity or cruelty—you shall find [Petitioner] to be guilty.  And then again, jurors, you would either check or not check extreme atrocity or cruelty.

*Id.*

Subsequently, in the instruction specifically challenged here by Petitioner, the

judge instructed the jury as follows regarding the facts to be found:

> Now, I say this to you.  You're charged with finding the facts.  *It's your job.  I have nothing to do with it.  To find the facts.*  In this case you are being asked to determine what happened at Apartment 9 located at 49 Dunham Street in Attleboro during the evening hours of July the 10th, 2011.  That inquiry by this jury presents, among others, the following examinations.  One, who was there that night?  Two, when did each party arrive?  Three, what was each party's purpose in going to that apartment that night?  Four, what did each party do?  And five, what was the sequence of events?  And I'm going to repeat those.  Who was there that night?  When did each party arrive?  *What was each party's purpose in going to Room No. 9 at 49 Dunham Street?  What did each party do inside that room?*  What was the sequence of events?

SA 318 (emphasis added); *see also id.* at 480.

Immediately thereafter, the judge clarified that:

> Examining the above points involves considering the evidence, the thirty-eight exhibits—excuse me—the sixty-six exhibits, the thirty-eight witnesses.  And you determine from that what you believe, and you also determine something else that's important.  The degree to which you believe it.  The confidence you have in that witness' credibility.

SA 318–19.

Later in the instructions, the judge reiterated that it was the jury's role to decide the

facts and that the burden of proof beyond a reasonable doubt remained on the prosecution

as follows:

> Jurors, I am neutral in this case.  I have no role in the facts.  And if I ever suggested to you that I have a view of this case, that's arrogant on my part.  That is not something I want to convey.  I respect you; and if I did that unconsciously, you disregard it.
>
> . . .
>
> The burden of proof is upon the prosecutor.  All presumptions of law independent of evidence are in favor of innocence, and every person is presumed to be innocent until proven guilty.  If upon such proof, there is reasonable doubt remaining, the accused is entitled to the benefit of it by acquittal.

SA 326–27.

Near the conclusion of the instructions, the judge advised the jury regarding the foreperson's role and suggested as follows regarding the deliberations:

> You want to have a deliberation that's organized, that's a good thorough deliberation.  You want to be organized.  Set up an organized way of approaching this before you start talking about this.  Sort of set up the organizational parameters first, I would suggest.  Then how do we get started?  Well, I think you get started by—and this is a suggestion—each one of the twelve talking about something.   Just talk about something.  And when you're talking about something, I think you want to, I think, observe this.

SA 328.

### ii.  SJC Proceedings

Petitioner argued to the SJC that the challenged jury instruction impermissibly shifted to him the burden of proving that there was another person who murdered the victim in contravention of *Sandstrom* and *Bihn v. United States*, 328 U.S. 633 (1946).  SA 66–68.  In support, Petitioner characterized the government's case against him as "entirely circumstantial," and contended that his credibility was a "central issue for the jury" given that "the only evidence that a fourth man existed and had been in the [victim's] room . . . came from [Petitioner's] testimony."  *Id.* at 68.  He asserted that the above instruction "placed the burden on [him] to provide evidence of [the identity of] the fourth man . . . and

what [the fourth man] had done while in the room; essentially, requiring him to prove that the fourth man actually murdered [the victim]." *Id.* at 66.

Respondent countered that the challenged instruction simply focused the jury's attention on the "central factual question before them," posing "general questions about the underlying facts," and asking them "what happened in [the victim's] room the night he was murdered[.]" SA 364–66. Respondent did not address Petitioner's *Sandstrom* argument, but contended that this case was unlike *Bihn* because, here, the judge's questions within the instruction "did not directly implicate" Petitioner; nor did they "suggest that [Petitioner] had any obligation to prove the identity of some third-party culprit." *Id.* at 365.

Although the SJC found that the instruction was "ill advised," it nevertheless suggested that there was no instructional error. SA 480. In support, the SJC distinguished the instruction from that in *Bihn*, finding that "while the instruction posed factual questions to the jury that were *tangential* to finding the elements of the crime, unlike in *Bihn*, the judge did not require the jury to find these tangential facts." *Id.* (emphasis added). Additionally, the SJC found that "looking at the instructions as a whole," trial counsel's failure to object "did not create a substantial likelihood of miscarriage of justice." *Id.* In support, the SJC noted that the trial judge "began the instruction by reiterating that he had no role in finding the facts," which "was the sole province of the jury." *Id.* It further noted in support the prior instruction in which the judge stated that he was "going to bring up suggestions[,] [and] [n]ot requirements." *Id.*

### iii. Instructional Error

#### a. Relevant Legal Standards

Jury instructions may be challenged as constitutionally infirm if they had the effect of relieving the State of its burden of persuasion, namely beyond a reasonable doubt, on an essential element of a crime. *See Francis v. Franklin*, 471 U.S. 307, 313 (1985) (citing *Sandstrom*, 442 U.S. at 520–24); *United States v. Fernandez-Jorge*, 894 F.3d 36, 53 (1st Cir. 2018). That is because "[t]he Due Process Clause of the Fourteenth Amendment 'protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.'" *Francis*, 471 U.S. at 313 (quoting *In re Winship*, 397 U.S. 358, 364 (1970)). This "bedrock, 'axiomatic and elementary' [constitutional] principle," *In re Winship*, 397 U.S. at 363 (citation omitted), "prohibits the State from using evidentiary presumptions in a jury charge that have the effect of relieving the State of its burden of persuasion beyond a reasonable doubt of every essential element of a crime." *Francis*, 471 U.S. at 313.

In *Sandstrom*, the Supreme Court held that a jury instruction violated the Due Process Clause of the Fourteenth Amendment because it relieved the government of its burden to establish every element of the charge beyond a reasonable doubt. 442 U.S. at 523–24. There, the defendant had been charged with murder, but argued that he did not "purposely or knowingly" kill his victim, as required under Montana law for "deliberate homicide." *Id.* at 512. At his trial, Petitioner challenged an instruction that told the jury that "[t]he law presumes that a person intends the ordinary consequences of his voluntary acts." *Id.* at 513. The Supreme Court concluded that the challenged instruction may have

been interpreted by the jury to create a presumption in favor of the government on the element of intent. *Id.* at 518–19.

Soon thereafter, in *Francis*, the Supreme Court invalidated instructions which told the jury that "(1) '[t]he acts of a person of sound mind and discretion are presumed to be the product of the person's will, but the presumption may be rebutted[,]' and (2) '[a] person of sound mind and discretion is presumed to intend the natural and probable consequences of his acts but the presumption may be rebutted.'" 471 U.S. at 309. The instructions were given in a murder trial in which intent was the only contested issue. *Id.* at 309, 311. The Court invalidated the instructions, stating that they violated the defendant's due process rights by shifting to him the burden of demonstrating a lack of intent. *See id.* at 325. "The challenged sentences are cast in the language of command. . . . The jurors 'were not told that they had a choice, or that they might infer that conclusion; they were told only that the law presumed it.'" *Id.* at 316 (quoting *Sandstrom*, 442 U.S. at 515). In regard to conclusive or irrebuttable presumptions, like those at issue in *Sandstrom*, the Court observed that "[a]n irrebuttable or conclusive presumption relieves the State of its burden of persuasion by removing the presumed element from the case entirely if the State proves the predicate facts." *Id.* at 317.

In so holding, the *Francis* Court explained the difference between mandatory and permissive presumptions, noting that "[t]he threshold inquiry in ascertaining the constitutional analysis applicable to this kind of jury instruction is to determine the nature of the presumption it describes." 471 U.S. at 313–14 (quoting *Sandstrom*, 442 U.S. at 51). A mandatory presumption instructs the jury that it must infer the presumed fact if the State proves certain predicate facts. *See id.* at 314. A permissive inference suggests to the jury

a possible conclusion to be drawn if the State proves predicate facts, but does not require the jury to draw that conclusion. *See id*.

The *Francis* Court then explained:

> Mandatory presumptions must be measured against the standards of *Winship* as elucidated in *Sandstrom*. Such presumptions violate the Due Process Clause if they relieve the State of the burden of persuasion on an element of an offense. A permissive inference does not relieve the State of its burden of persuasion because it still requires the State to convince the jury that the suggested conclusion should be inferred based on the predicate facts proved. Such inferences do not necessarily implicate the concerns of *Sandstrom*. A permissive inference violates the Due Process Clause only if the suggested conclusion is not one that reason and common sense justify in light of the proven facts before the jury.

471 U.S. at 314–15 (citations omitted).

*b.* Analysis

The law set out in *Sandstrom* and *Francis* was clearly established at the time of the SJC's decision in this case (and at the time of Petitioner's trial). *Strickland*'s two-pronged test for ineffective assistance of counsel was also clearly established well before the proceedings in Petitioner's case. Thus, the Court's task is to determine whether the SJC, in deciding that the instruction at issue was not unconstitutional, such that counsel did not render ineffective assistance of counsel under *Strickland*, reached a decision that was "contrary to" or "an unreasonable application of" *Sandstrom*, *Francis*, *Bihn*, and/or *Strickland*. 28 U.S.C. § 2254(d)(1); *see also Alves*, 115 F. Supp. 2d at 56–57.

In his federal habeas briefs, Petitioner repeats the arguments that he made before the SJC, contending that the challenged instruction placed the burden on him to show that someone else had killed the victim contrary to both *Sandstrom* and *Bihn*. ECF No. 19 at 16.

Although Petitioner has not challenged here the trial judge's particular instructions regarding the requisite elements of the offense for which he was convicted, determining the existence of a due process violation based on a shifting of burdens requires the Court's consideration of Massachusetts law regarding the elements and factors that the Commonwealth was required to prove beyond a reasonable doubt.  *See* SA 306–09 (describing elements of first degree murder by extreme atrocity or cruelty); *see also Figueroa v. Gelb*, No. CV 13-13008-IT, 2016 WL 3147354, at *11 (D. Mass. Apr. 20, 2016), ("examining Massachusetts law," including the "SJC's exposition of the parameters of first and second degree murder," to which a "federal habeas court is 'duty bound' to adhere," in evaluating habeas petitioner's claim that jury instruction allowed the jury to draw an "unconstitutional inference" in violation of *Franklin* and *Sandstrom* (quoting *Powell v. Tompkins*, 783 F.3d 332, 340 (1st Cir. 2015))), *report and recommendation adopted*, No. 13-cv-13008, 2016 WL 3149652 (D. Mass. June 3, 2016); *see also Alves*, 115 F. Supp. 2d at 58–62 (examining Massachusetts law regarding "malice" in conjunction with Petitioner's federal habeas claim that his trial counsel's failure to object to jury instruction constituted ineffective assistance of counsel); *Ainooson v. Gelb*, 973 F. Supp. 2d 105, 125–26 (D. Mass. 2013) (examining Massachusetts law regarding second degree murder in evaluating federal habeas petitioner's claims that jury instructions violated his Due Process rights).

Petitioner does not dispute that the trial court here instructed the jury in accordance with Massachusetts law regarding the required elements at the time of Petitioner's trial. *See* SA 306–09 (noting that in order to find Petitioner guilty of murder in the first degree committed by extreme atrocity or cruelty, the jury was required to find:  (1) Petitioner

committed an unlawful killing; (2) the killing was committed with an actual intent to kill the victim or cause him grievous bodily harm, or intended to do an act which, in the circumstances known to Petitioner, a reasonable person would have known created a plain and strong likelihood that death would result; and (3) the presence of at least one of the seven factors demonstrating extreme atrocity or cruelty, as listed by the judge); *see also Commonwealth v. Shakespeare*, 222 N.E.3d 418, 437–38 (Mass. 2023); *Cunneen*, 449 N.E.2d at 665; *Castillo*, 153 N.E.3d at 1217–19.

Rather, the main thrust of Petitioner's argument is that the challenged instruction impermissibly shifted the Commonwealth's burden onto him to prove that someone else committed the murder, thus undermining his presumption of innocence. The question before the Court is, therefore, "whether the challenged jury instruction had the effect of relieving the [Commonwealth] of the burden of proof enunciated in *Winship*" on the "critical" elements of first degree murder by extreme atrocity or cruelty, as set forth above, including whether Petitioner killed the victim. *See Sandstrom*, 442 U.S. at 521; *see also Ainooson*, 973 F. Supp. 2d at 125–26.

The Court must first define the nature of the challenged instruction and any presumptions contained therein. *See Francis*, 471 U.S. at 313–14 ("The threshold inquiry in ascertaining the constitutional analysis applicable to this kind of jury instruction is to determine the nature of the presumption it describes," namely, "whether the challenged portion of the instruction creates a mandatory presumption or merely a permissive inference." (citation omitted)). In so doing, the Court's

> [a]nalysis must focus initially on the specific language challenged, but the inquiry does not end there. If a specific portion of the jury charge, considered in isolation, could reasonably have been understood as creating a presumption that relieves the State of its burden of persuasion

39

> on an element of an offense, the potentially offending words must be
> considered in the context of the charge as a whole. Other instructions
> might explain the particular infirm language to the extent that a
> reasonable juror could not have considered the charge to have created
> an unconstitutional presumption. . . . This analysis "requires careful
> attention to the words actually spoken to the jury . . . , for whether a
> defendant has been accorded his constitutional rights depends upon the
> way in which a reasonable juror could have interpreted the instruction."

*Francis*, 471 U.S. at 315 (quoting *Sandstrom*, 442 U.S. at 514). As noted, in suggesting

that there was no instructional error, the SJC here found that the questions in the

challenged instruction pertained to "tangential" facts and, additionally, that the trial judge

"*did not require* the jury to find the[] tangential facts." SA 480 (emphasis added).

Petitioner argues that the SJC's interpretation of the instruction was unreasonable. ECF

No. 19 at 18.

Petitioner analogizes the challenged instruction to the instruction in *Bihn*. ECF

No. 19 at 17–18; *Bihn*, 328 U.S. at 636–37. In *Bihn*, the petitioner was one of several

defendants charged with conspiracy to violate the statute and regulations governing the

rationing of gasoline. 328 U.S. at 634. With regards to "the crucial issue," that is whether

the petitioner stole the ration coupons from the bank where she was employed, the *Bihn*

trial judge inquired:

> Who would have a motive to steal [the ration coupons]? Did she take
> these stamps? You have a right to consider that. She is not charged with
> stealing, but with conspiracy to do all these things, and you have a right
> to consider whether she did steal them, on the question of intent. *Did
> [the petitioner] steal them? Who did if she didn't? You are to decide
> that.*

*Id.* at 635–37.

In finding instructional error, the Supreme Court held that the challenged

instruction in that case could "be read as telling the jurors that if petitioner by her

testimony had not convinced [the jury] that someone else had stolen the ration coupons,

40

she must have done so." *Id.* at 637.  In other words, the *Bihn* instruction "put[] on [the defendant] the burden of proving her innocence by proving the identity of some other person as the thief." *Id.* (citation omitted).

Petitioner argues that the instruction here—which asked the jury to consider who arrived when, their purpose, and who was in the victim's apartment that night— operated in a manner similar to the instruction in *Bihn.*  ECF No. 19 at 17–18.  He contends that the SJC's determination to the contrary was unreasonable, especially as concerned the SJC's determination that the challenged instruction pertained to "tangential" facts or issues and that it did not "require" the jury to find any facts.  *Id.* at 18–19.

In particular, Petitioner reiterates that the challenged instruction required the jury to consider whether another person (a "fourth man") was present at the scene and his motive.  ECF No. 19 at 18.  In other words, he asserts that the jury was asked to consider whether it believed Petitioner's defense that he was not the person that killed the victim. *See id.*  According to Petitioner, the judge's questions were similar to the questions in *Bihn*, and thus shifted onto him the burden to prove that he was not the one who killed the victim.  SA 318.

Petitioner also notes that because the questions asked in the challenged instruction required the jury to find the killer's "motive"—and because his testimony was the sole evidence before the jury regarding the existence of a fourth man at the victim's apartment, and he *did not* testify regarding that man's "motive"—the instruction required the jury to make factual findings not based on the evidence.  ECF No. 25 at 4–5; *see also* SA 318 (asking "Three, what was each party's purpose in going to that apartment that night?" and reiterating, "What was each party's purpose in going to Room No. 9 at 49 Dunham

41

Street?").  Petitioner contends the question regarding the fourth man's purpose or motive created "an impossible situation" for him since he was unable to provide such a motive or purpose and that this "impossible situation" undermined his credibility and his presumption of innocence.  ECF No. 25 at 5.

Furthermore, Petitioner contends that the SJC's finding that the instruction did not "require" the jury to find the facts called for by the questions in the instruction was itself an unreasonable interpretation of the instruction—which included the judge's admonition to the jury that "it's your job" to find the facts—along with consideration of the other instructions as a whole.  ECF No. 19 at 19–20.  In support, Petitioner argues that the SJC unreasonably failed to differentiate this instruction from the judge's other instructions regarding "suggestions," which were limited to describing the jury's "deliberative process"—not to its finding of facts.  *Id.* at 18–19.  He asserts that the challenged instruction instead concerned "required" or mandatory factfinding, and impermissibly advised the jury about "specific facts [that it] should find in coming to [a] verdict."  *Id.* at 18–20.

Respondent counters that the SJC's determination that the challenged instruction did not "require" the jury to make any findings was reasonable.  Specifically, Respondent argues that it was reasonable for the SJC to make the connection that it did between the findings called for by the challenged instruction and the judge's earlier instructions regarding optional "suggestions."  ECF 29 at 15.  In support, Respondent notes that the judge labeled the factual questions in the challenged instruction as "examinations," which it contends could "reasonably [have been] understood to be part of the 'deliberative process'" described by the judge's prior instructions.  ECF No. 29 at 18 (quoting SA 318).

Accordingly, Respondent suggests that the SJC's finding that the jury would not have interpreted the questions in the challenged instruction to "require" answers was reasonable. *Id.*

With regards to the SJC's additional finding that the instruction posed "tangential" questions calling for "tangential" facts, Respondent acknowledges the SJC's characterization of the questions as "tangential," but does not address Petitioner's argument that the SJC's finding was unreasonable. *See* ECF No. 29 at 17–20.

Addressing Petitioner's arguments regarding the SJC's interpretation of *Bihn,* Respondent counters that the SJC reasonably determined that this case was unlike *Bihn*. ECF No. 29 at 19–20. In support, Respondent notes that the judge's questions here did not mention Petitioner as the possible assailant; nor, according to Respondent, did the judge "require[] [the jury] to figure out who else [the assailant] could be." *Id.*.

### 1.   Requirement v. "Suggestion"

The Court agrees with Petitioner that the SJC's finding that the jury would have assumed that it was not "required" to answer the judge's questions in the challenged instruction was unreasonable.

The Supreme Court has repeatedly stated that it "presumes that jurors, conscious of the gravity of their task, attend closely to the particular language of the trial court's instructions in a criminal case and strive to understand, make sense of, and follow the instructions given them." *Francis*, 471 U.S. at 324 n. 9; *see also Richardson v. Marsh*, 481 U.S. 200, 206 (1987) (referring to "the almost invariable assumption of the law that jurors follow their instructions"); *Parker v. Randolph*, 442 U.S. 62, 73 (1979) (opinion of Rehnquist, J.) ("A crucial assumption underlying [the] system [of trial by jury] is that

43

juries will follow the instructions given them by the trial judge. Were this not so, it would be pointless for a trial court to instruct a jury, and even more pointless for an appellate court to reverse a criminal conviction because the jury was improperly instructed.")

Here, the challenged instruction itself was prefaced with a directive admonishing the jury that "[i]t's your job" to find the facts. SA 318. There was no language in the challenged instruction that would have caused a reasonable jury to have concluded that it was not required to answer the questions posed by the judge in the challenged instruction.

### 2. "Tangential" v. Central or "Crucial" Facts

The Court additionally agrees that the SJC's characterization of the facts referenced in the judge's instruction as "tangential" was unreasonable. In support, the Court notes that Respondent, in its own brief to the SJC, characterized the questions in the challenged instructions as "central" to the issues in the case. SA 364. In particular, Respondent noted that:

> [T]he challenged instruction focused the jury's attention on the central factual question before them: what happened in [the victim's] room the night he was murdered? Where the only charge at issue was murder, and there was no evidence that the murder could have occurred anywhere other than [the victim's] room, determining whether the evidence resolved that disputed question was a necessary precondition to deciding whether the evidence proved the [Petitioner's] guilt beyond a reasonable doubt.

*Id.* at 364–65 (emphasis added).

The Court agrees with Respondent's above characterization of the challenged jury questions as calling for facts "central" to Petitioner's case.

### 3. Comparison with Instruction in *Bihn*

The SJC's mischaracterization of the instruction as calling for "tangential" facts that the jury was not "required" to find, is, nevertheless, not determinative of the Court's

44

ultimate § 2254(d)(1) conclusion regarding the SJC's application of *Bihn* to this case. While the SJC may have mischaracterized the instructions, it did not unreasonably apply *Bihn*; nor was its holding contrary to the Supreme Court's decision in *Bihn* under § 2254(d)(1).

Because the claims here constitute mixed questions of law and fact,[15] the Court has reviewed the SJC's related instructional interpretation and IAC determinations under § 2254(d)(1). *See Yeboah-Sefah*, 556 F.3d at 70. And, in doing so, the Court concludes that despite any instructional mischaracterizations, the SJC's overarching determination was not contrary to or an unreasonable application of *Bihn*. That is largely because the instructional questions in this case, although "central" to the key issues and "required" by the jury, did not single out or implicate Petitioner in the same manner that the instructions in *Bihn* targeted the petitioner there.[16] *See* SA 365–66; ECF No. 29 at 19–20.

Review of the language of the challenged instruction and the instructions as a whole demonstrates that the SJC's application of *Bihn* was not unreasonable because the

---

[15] To the extent Petitioner intended to argue that the SJC's mischaracterizations in interpreting the instruction constituted unreasonable determinations of the facts that entitle him to relief under § 2254(d)(2), the Court notes that is *not* the applicable section for evaluating claims involving questions of mixed law and fact, like the instructional and ineffective assistance claims here. *See Dolinger v. Hall*, 302 F.3d 5, 8 n.5 (1st Cir. 2002) (holding that § 2254 (d)(1) applied to the petitioner's Confrontation Clause claim because it "present[ed] a mixed question of law and fact"). Rather, § 2254(d)(2) "applies exclusively to determinations of basic, primary, or historical facts, not to mixed questions of fact and law, which are more amenable to analysis under section 2254(d)(1)." *Morales v. Russo*, 401 F. Supp. 2d 170, 176 (D. Mass. 2005) (quoting *Dolinger*, 302 F.3d at 8 n.5).

[16] Respondent additionally argues that this case is unlike *Bihn* based on the strength of the case against Petitioner here. This is an issue of prejudice, though, which the Court has addressed below, separate from the issue regarding the existence of instructional error.

instruction here did not purport to shift to Petitioner the burden of proving who killed the victim. To be comparable to the *Bihn* instruction, the instruction here would have needed to ask the jury, "Did Petitioner murder the victim? Who did if he didn't?" *See Bihn*, 328 U.S. at 637 (asking the jury "Did she [the petitioner] steal them [the stamps]? Who did if she didn't? You are to decide that."). Instead, the instruction here more generally asked the jury important scene-setting questions like, "Who was there that night? . . . What was each party's purpose?" without any specific reference to Petitioner. SA 318.

### 4. Burden Shifting

Petitioner also argues that the SJC generally failed to address whether the instruction in fact shifted the burden of proof to him to prove his innocence. ECF No. 19 at 18. The Court disagrees. At a minimum, the SJC implicitly concluded that no burden shifted to Petitioner when it found that the challenged instruction "*did not require* the jury to find" the facts called for by the questions. SA 480 (emphasis added). For the reasons below, the Court concludes that this implicit determination that there was no impermissible shifting of the burden of proof also did not constitute an unreasonable application of clearly established federal law under § 2254(d)(1).

As noted, Petitioner contends that the challenged instruction impermissibly shifted the Commonwealth's burden onto him to prove that he was not the one who committed the murder.

Respondent counters that it was reasonable for the SJC to find that no burden shifted because the judge "made it abundantly clear throughout the instructions that the burden of proof never shifted" to the Petitioner. ECF No. 29 at 17.

Again, in ascertaining whether the burden shifted on an element of the offense, the Court notes that state law is controlling regarding the elements the Commonwealth was required to prove in order for the jury to find that the Petitioner committed the murder. *See Powell*, 783 F.3d at 337; *Waddington*, 555 U.S. at 192 n.5. In proving that Petitioner killed the victim, Massachusetts law did *not* require the Commonwealth to "prove that no person other than the defendant could have committed the crime."[17] *Shakespeare*, 222 N.E.3d at 433 (quoting *Commonwealth v. Morgan*, 868 N.E.2d 99, 106 (Mass. 2007)).

Instead, under Massachusetts law, "[t]he issue . . . 'is whether the evidence pointing to [the] defendant as the actual perpetrator [is] in equipoise with the evidence pointing to [another person], or whether there [is] instead evidence pointing more strongly in the direction of the defendant such that the jury could rationally infer that he was the principal'" beyond a reasonable doubt. *Shakespeare*, 222 N.E.3d at 433 (quoting *Morgan*, 868 N.E.2d at 107); *id.* at 436–37 ("Taking together all the above evidence, a jury reasonably could infer beyond a reasonable doubt that it was the defendant who killed the victim, as supported by his interactions and argument with the victim indicating a prior relationship of some type, his proximate location in the rear lot as related to the placement of a shell casing and the victim's wounds, his movements during the relevant time, and the

---

[17] The SJC has recognized that "[t]he Commonwealth may submit a case wholly on circumstantial evidence." *Morgan*, 868 N.E.2d at 109 (citing *Commonwealth v. Merola*, 542 N.E.2d 249, 252 (Mass. 1989)). Moreover, "[t]he inferences drawn from circumstantial evidence 'need only be reasonable and possible[, not] necessary or inescapable.'" *Id.* (citations omitted). Furthermore, "the Commonwealth is not required to exclude every reasonable hypothesis of innocence if the trial record, viewed in its entirety, supports a conclusion of guilt beyond a reasonable doubt." *Commonwealth v. Chism*, 251 N.E.3d 1136, 1171 (Mass. 2025) (citing *Commonwealth v. Platt*, 798 N.E.2d 1005, 1009 (Mass. 2003)).

consciousness of guilt evidence."); *cf. Morgan*, 868 N.E.2d at 106–08 (evidence pointed more strongly toward defendant's culpability where defendant made inculpatory statements, there was no evidence that third party shared hostility toward victim, and defendant was seen in possession of potential murder weapons); *Commonwealth v. Mazza*, 504 N.E.2d 630, 633 (Mass. 1987) (insufficient evidence for murder conviction where there was no evidence that victim was killed while defendant was present at murder scene).

Here, the challenged instruction, when viewed in light of the jury instructions as a whole, was not contrary to Massachusetts law regarding what the Commonwealth needed to prove to establish Petitioner as the killer. Nor did the instruction state that Petitioner was required to prove that someone else committed the murder. *See* SA 318. While the instructional questions asked the jury to make evidentiary findings that were central to the case, they did not operate to shift the ultimate burden to Petitioner to prove or disprove any of the central facts it referenced.

The instruction here also did not create presumptions that resulted in burden shifting like those present in *Sandstrom* and *Francis.* Both of those cases involved jury instructions that used language that a reasonable juror could have understood to create a mandatory presumption on an essential element of a crime and, therefore, impermissibly shifted the burden. *See Francis*, 471 U.S. at 309 (involving instruction that "acts of a person of sound mind and discretion are presumed to be the product of the person's will" and that a person "is presumed to intend the natural and probable consequences of his acts"); *Sandstrom*, 442 U.S. at 512 (concerning instruction that "the law presumes that a person intends the ordinary consequences of his voluntary acts"). By contrast, the

instruction at issue here did not reference or contain any mandatory presumptions in contravention of the holdings in *Francis* or *Sandstrom*; nor has Petitioner pointed to any such impermissible presumption.  Thus, the SJC's determination that there was no burden shifting was not an unreasonable application of *Sandstrom* or *Francis*.  *See, e.g.*, *Silva v. Tompkins*, No. 15-cv-10681, 2019 WL 1866317, at *12 (D. Mass. Apr. 25, 2019).

In sum, for the reasons above, the Court concludes that the SJC's determination that there was no instructional error was neither contrary to nor an unreasonable application of clearly established federal law.  *See Estelle*, 502 U.S. at 72.  Alternatively, as discussed below, even if the SJC's determination on the issue of instructional error could be held to constitute an unreasonable application of *Bihn* or *Sandstrom*, the SJC's related prejudice determination itself constitutes a sufficient basis for denying federal habeas relief as to this challenged jury instruction.

### iv.  Deficient Performance

The SJC did not expressly address counsel's performance regarding this challenged instruction other than to state that counsel's "failure to object did not create a substantial likelihood of a miscarriage of justice" under Massachusetts law.  SA 480.  As noted, however, "[w]hen a federal claim has been presented to a state court and the court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."  *Harrington*, 562 U.S. at 99; *see Johnson v. Williams*, 568 U.S. 289, 293 (2013) (applying *Harrington*); *Montanez v. Mitchell*, No. 12-cv-11882, 2014 WL 949602, at *3 (D. Mass. Mar. 10, 2014) (noting that "the First Circuit has not yet explicitly determined the effect of

[*Harrington v.*] *Richter* and *Johnson* on *Fortini* [*v. Murphy*, 257 F.3d 39, 47 (1st Cir. 2001)]").

The First Circuit requires this Court, when reviewing a habeas petition, to treat the SJC's above conclusion as "subsum[ing] both the *Strickland* test for determining constitutionally deficient performance by defense counsel and the *Strickland* test for determining whether such deficient performance was prejudicial." *Walker*, 911 F.3d at 636; *see also Zuluaga*, 585 F.3d at 30. Accordingly, the Court assumes that, while not expressly stated, the SJC concluded that counsel's performance was not deficient.

Where, as here, "a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief."[18] *Harrington*, 562 U.S. at 98. For the reasons above, the Court has concluded that the SJC's determination that there was no instructional error was reasonable and not contrary to clearly established law. Given the absence of instructional error, the SJC's implicit determination that Petitioner's counsel's failure to object to the instruction was not deficient was similarly neither contrary to nor an unreasonable application of clearly established federal law. *See Alves*, 115 F. Supp. 2d at 56 (treating Massachusetts appellate court's conclusion that jury instruction was not erroneous as a state court determination that the petitioner failed to meet the first performance prong under *Strickland* in a case involving similar "hybrid" IAC claims).

---

[18] In such cases where the state court's reasoning is absent, "an independent review of the record is required to determine whether the state court clearly erred in its application of controlling federal law." *Gaines v. Matesanz*, 272 F. Supp. 2d 121, 128 (D. Mass. 2003) (quoting *Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000)).

v. Prejudice

Alternatively, even if, contrary to the Court's conclusion above, there was an

instructional error under *Estelle,* and, as a result, deficient performance under *Strickland*

such that the SJC's determinations regarding instructional error and performance could be

considered unreasonable under § 2254(d), federal habeas relief is not warranted because

the SJC's determination that there was no prejudice itself was neither contrary to nor an

unreasonable application of clearly established federal law.

The SJC did not expressly address prejudice under *Strickland* regarding this

challenged instruction other than to state that counsel's "failure to object did not create a

substantial likelihood of a miscarriage of justice" under Massachusetts law.  SA 480.

Again, as noted above, this court must presume the SJC's finding to be a determination

that there was no prejudice under *Strickland.  See Harrington*, 562 U.S. at 99; *Walker*, 911

F.3d at 636; *see also Zuluaga*, 585 F.3d at 30.

Accordingly, the Court assumes that, while not expressly stated, the SJC concluded

that there was no prejudice under *Strickland*.  Here, as noted, the appropriate inquiry

regarding prejudice is whether "'fairminded jurists' would all agree" that the SJC's

determination that there was no reasonable probability that the result of the proceeding

would have been different had counsel objected to the challenged instruction was itself an

unreasonable application of clearly established federal law.  *See Jewett*, 634 F.3d at 75

(quoting *Harrington*, 562 U.S. at 101); *see Harrington*, 562 U.S. at 104–05.

Petitioner argues prejudice under *Bihn,* suggesting that the instructions in this case

were more damaging than those in *Bihn*.  There, the Court found the instructional error

was prejudicial given the close or "evenly balanced" evidence.[19]  328 U.S. at 638 (noting

that the "case against petitioner was not open and shut").  Petitioner asserts that in *Bihn*,

exculpatory evidence existed outside of the defendant's own testimony.  ECF No. 19 at 18

(noting that "it appears there was evidence other than the defendant's testimony that other

people had access to the ration coupons" at issue in the case).  By contrast, Petitioner

contends that here the only exculpatory evidence regarding the existence of another person

came from Petitioner's own testimony.  *Id.*  Accordingly, Petitioner asserts that the

challenged instruction in this case placed an even greater burden on him (than that placed

on the *Bihn* defendant) to prove someone else had murdered the victim.  *See id.* at 17–18

Respondent counters that the evidence against Petitioner was "substantial," unlike

the case against the Petitioner in *Bihn*.  ECF No. 29 at 20.

The Court notes that *Bihn* was decided prior to the Supreme Court's decisions in

*Brecht*, *Strickland*, and *Harrington*, which govern the prejudice showing required for the

instructional error and IAC claims in this case.  The standard utilized by the Supreme

Court for establishing prejudice in *Bihn*—a direct criminal appeal—was much different

and less stringent than the current applicable standard for prejudice in collateral federal

habeas proceedings.  *See* 328 U.S. at 638.  As a result of the different postures and

applicable legal standards, the existence of prejudice in this case cannot be established

simply by comparing the facts here with the facts in *Bihn*.

---

[19] In determining whether there was prejudice, the *Bihn* Court analyzed a different federal statute, 28 U.S.C. § 391, and, contrary to the federal habeas prejudice standards applicable here, placed the burden on the government/respondent to demonstrate a lack of a prejudice.  *See* 328 U.S. at 638.

Moreover, the Court notes that the SJC, in finding that a different instruction did not prejudice Petitioner, highlighted the trial judge's other instructions and the strength of the evidence against Petitioner.  SA 483.  In particular, the SJC concluded that counsel's failure to object to the other erroneous instruction did not prejudice Petitioner because of the trial judge's other instructions regarding reasonable doubt; his "scrupulous[] focus[] on [Petitioner] receiving a fair trial;" and because "the Commonwealth's case against [Petitioner] was strong."  *Id.*

Respondent argues that the SJC's determination characterizing the case against Petitioner as "strong" was reasonable.  ECF No. 29 at 18 (citing SA 483, 487 n.24).  In support Respondent asserts that "[n]ot only had [Petitioner] admitted to being in the same room as the victim on the night of the murder, . . . but when [he] was arrested two days later, police found blood on his shoe that matched the victim's DNA, as well as other items in his backpack that had the victim's blood on them."  *Id.*

Petitioner counters that the case against him was not strong and notes the existence of a hung jury in his first trial.  ECF No. 19 at 26.  He contends that at least one person from that hung jury must have "retained a reasonable doubt," which means that juror "would necessarily have to ha[d] credited [Petitioner's] testimony . . . since [it] was the only evidence offered to counter the Commonwealth's circumstantial case."  *Id.*; *see also* ECF No. 25 at 6.

Additionally, in suggesting that the Commonwealth's case was not strong, Petitioner argues that Respondent and the SJC "fail[] to note that [Petitioner's] testimony explained his reason for being in the [victim's] room, that [Petitioner] had gotten into a bloody fistfight with the victim, and that there was another man in the room when

[Petitioner] left."  ECF No. 25 at 6.  He suggests that counsel's failure to object to the instruction negatively impacted the jury's "ability to fairly assess the evidence," and his testimony in particular.  *Id.* at 6–7.

Contrary to Respondent's suggestion, in assessing the prejudice associated with an IAC claim based on counsel's failure to object to an allegedly burden-shifting instruction, the Supreme Court has clearly held in *Francis* and *Sandstrom* that the existence of other "general instructions on the State's burden of persuasion and the defendant's presumption of innocence . . . [does] not dissipate [any burden-shifting] error in the challenged portion of the instructions."  *Francis*, 471 U.S. at 319–20; *Sandstrom*, 442 U.S. at 518 n. 7 (noting that additional instructions that are accurate regarding the presumption of innocence and burdens of proof are not "rhetorically inconsistent with a conclusive or burden-shifting presumption," because "[t]he jury could have interpreted the two sets of instructions as indicating that the presumption was a means by which proof beyond a reasonable doubt as to intent could be satisfied"); *accord Hill v. Maloney*, 927 F.2d 646, 651 (1st Cir. 1990) ("Even an instruction directly contrary to the erroneous one, which by itself correctly stated the law, 'will not suffice to absolve the infirmity,' because '[a] reviewing court has no way of knowing which of the two irreconcilable instructions the jurors applied in reaching their verdict'" (quoting *Franklin*, 471 U.S. at 322)).  Accordingly, Respondent's argument that Petitioner is unable to demonstrate prejudice here given the trial judge's other jury instructions regarding the Commonwealth's burden of proof and Petitioner's presumption of innocence is without merit based on the nature of the instruction and this claim.

Nevertheless, "[w]hen the evidence of guilt is substantial, courts routinely have found no prejudice [under *Strickland*] resulting from counsel's failure" to object regarding a jury instruction. *Janosky v. St. Amand*, 594 F.3d 39, 45 (1st Cir. 2010); *see also Scarpa v. Dubois*, 38 F.3d 1, 16 (1st Cir. 1994) (attorney's deficient performance did not prejudice the petitioner given "the one-sidedness of the evidence" of guilt and because the petitioner "failed to identify any promising line of defense or to construct a plausible scenario that, if exploited, might have given the jury pause"); *Walker*, 911 F.3d at 637 (noting that in assessing prejudice under *Strickland*, the federal habeas court "must, like the SJC, consider the rest of the evidence to assess the possible impact of" Petitioner's counsel's performance).

For example, in *Walker*, the First Circuit held that the petitioner's trial counsel's failure to object to troubling witness identification procedures did not prejudice the Petitioner given other evidence of his guilt. 911 F.3d at 635–37. In particular, the *Walker* court pointed to evidence aside from the challenged witness identification, including testimony from law enforcement regarding the petitioner's gang membership and his "desire for retribution," along with another witness's incriminating testimony regarding the petitioner's role in the shooting at issue. *Id.* at 637; *see also Lynch v. Ficco*, 438 F.3d 35, 49 (1st Cir. 2006) (agreeing with SJC, and holding that "even if counsel's performance [in failing to object to jury instructions] were deficient," there was no prejudice because "the 'center of gravity' of the charge plainly rested on the side of the correct instruction" and the charge "read, as a whole, could not have been understood to relieve the Commonwealth of its burden to prove beyond a reasonable doubt every element of the crime" (citation omitted)); *Alves*, 115 F. Supp. 2d at 62–64 (holding that petitioner's trial

counsel's deficient performance in failing to object to erroneous instruction was not prejudicial where the other jury instructions adequately distinguished between "the degrees of murder and manslaughter"); *Torres v. O'Brien*, No. 15-cv-11901, 2018 WL 11309222, at \*16 (D. Mass. Nov. 6, 2018) (upholding on federal habeas review the SJC's determination that there was no prejudice on IAC claim based on counsel's failure to object to manslaughter instruction where "[s]cientific physical evidence, albeit not definitive, placed petitioner at the scene"), *report and recommendation adopted sub nom. Torres v. Mitchell*, No. 15-cv-11901, 2019 WL 12070286 (D. Mass. Sept. 3, 2019), *aff'd*, No. 19-1909, 2021 WL 9569375 (1st Cir. Dec. 23, 2021).

Petitioner has cited no controlling authority, and the Court is unaware of any, that provides that a state appellate court's determination that a case is "strong" or "substantial" is an unreasonable application of clearly established federal law simply because there was a prior hung jury. Here, as Respondent and the SJC noted, the Commonwealth introduced blood spatter evidence from the victim's bed, wall, ceiling, and elsewhere in room; photographic evidence of the victim's injuries; the neighbors' testimony regarding the timing and type of noises coming from the victim's apartment; and medical examiner testimony regarding the victim's time of death. *See* SA 277–94 (Commonwealth's closing argument); *id.* at 476–78. In addition to that evidence, the Commonwealth also introduced the following evidence linking Petitioner to the victim's apartment at the time of murder: a neighbor's identification of Petitioner; Petitioner's prior recorded statements in which he admitted to having been with the victim; Petitioner's trial testimony in which he admitted to having a fight with the victim on the night in question; the victim's and defendant's cell phone records; Petitioner's girlfriend's testimony; and DNA/blood evidence on

Petitioner's shoes and on a t-shirt and cigarettes in Petitioner's backpack that matched the victim's blood. *See id.*

Accordingly, the SJC's determination of no prejudice based on the strength of the case was reasonable. A state court case may be considered "strong" or "substantial" even if it is based on circumstantial evidence, as it was here. *See Olszewski v. Spencer*, 369 F. Supp. 2d 113, 141 (D. Mass. 2005) (on federal habeas review, concluding that "the case against the defendant was strong, albeit circumstantial"), *aff'd*, 466 F.3d 47 (1st Cir. 2006); *Little v. Murphy*, 62 F. Supp. 2d 262, 276 (D. Mass. 1999) ("Petitioner's conviction was the result of strong circumstantial evidence that he had the motive and opportunity to murder the victim, not the result of his counsel's performance."); *see also Hartsfield v. Dorethy*, 949 F.3d 307, 316 (7th Cir. 2020) (holding federal habeas petitioner could "not satisfy the prejudice prong under *Strickland*" where "as a preliminary matter, the circumstantial evidence against [him] was strong"); *White v. Lewis*, 874 F.2d 599, 604 (9th Cir. 1989) (holding that the possibility of prejudice on the petitioner's federal habeas claim was "remote at best" where there was "strong circumstantial evidence of guilt").[20]

---

[20] Massachusetts law explicitly recognizes that "[t]he Commonwealth may submit a case wholly on circumstantial evidence." *Morgan*, 868 N.E.2d at 106 (citing *Merola*, 542 N.E.2d at 252). "The inferences drawn from circumstantial evidence 'need only be reasonable and possible[, not] necessary or inescapable.'" *Id.* (quoting *Merola*, 542 N.E.2d at 252); *Commonwealth v. Latimore*, 393 N.E.2d 370, 374 (Mass. 1979) ("[T]he evidence and the [permissible] inferences . . . must be 'of sufficient force to bring minds of ordinary intelligence and sagacity to the persuasion of [guilt] beyond a reasonable doubt.'" (quoting *Commonwealth v. Cooper*, 162 N.E. 729, 731 (Mass. 1928))).

In sum, for the reasons above, the SJC's evaluation of Petitioner's IAC claim based on this challenged instruction was neither contrary to nor an unreasonable application of clearly established federal law.

3.   Hypothetical and Instructions Regarding Direct and Circumstantial Evidence

As in his appeal to the SJC, Petitioner argues here that he received ineffective assistance of counsel when his trial counsel failed to object to an additional series of jury instructions and a hypothetical that he contends reduced the Commonwealth's burden of proof in violation of *In re Winship*, invaded the province of the jury, and violated his right to be tried by a fair and impartial jury.  SA 73–79; ECF No. 29 at 26–28.

i.   Relevant Jury Instructions

The challenged instructions can be broken down into three categories, as addressed by the SJC.

a.   Hypothetical About Direct v. Circumstantial Evidence

The judge instructed the jury regarding the difference between direct and circumstantial evidence as follows:

> Now, the lawyers have spoken about direct evidence and circumstantial evidence.  I instructed you in the beginning of this case on the difference.  That is not a simple matter.  And I believe that my intent was begin [sic] the education in the precharge.  Start the jurors' ability to start to process this.  So I'm going to return to it, and I'm going to use the same two examples to teach.

> Direct evidence applies where we have a witness who observes the acts which relates to or constitutes the crime.  Again, in the case of a defendant charged with leaving the scene of an accident causing personal injury, the jury hears the following evidence.  Late at night, Joan Jones is driving down Thurston Road, a quiet road in Dighton.  Suddenly, Jones feels something forcefully strike the back of her car.  Jones' car strikes a tree, causing her to lose consciousness and leaving her with a broken rib.

Two days later, a man, a witness tells the police that while in a car driven by Jerry Smith on Thurston Road in Dighton, Jones (sic), the driver, started to text. His car swerved and struck a car that struck a tree, and Smith took off. The man identifies Jones' car as the car that was struck by Smith's vehicle. That's direct evidence. He says, "That's the car. I was there. I was with him. I saw what he did. I saw what happened in the car."

Conversely, we have circumstantial evidence where there's no witness who sees the defendant's commission of the crime, but the circumstances as a whole may permit the jury to infer—that's a conclusion—reasonably that the defendant got into an accident that caused personal injury and knowingly left the scene.

As an example, consider the following. Same accident as the first illustrating direct. Two, as in the earlier example, the driver leaves the scene without stopping. Three, as the car leaves the scene, a neighbor who heard the crash sees a dark Ford Taurus with a license plate starting with 1-0 leave the scene. A computer search of Registry of Motor Vehicle records covering a one mile radius from the accident scene identifies Jerry Smith as the owner of a dark green Taurus with its license plate starting 1-0. Next, the location of Thurston Road is consistent with the most efficient route of travel to Smith's home. The police go to Smith's home and see the Taurus that has left-hand front damage. The police seize the Taurus, and an accident reconstruction detective finds damage to the Taurus consistent with the damage to Jones' car and finds paint chips on the victim's car. Smith admits to driving the Taurus on the night of the accident, but denies striking any car on Thurston Road.

SA 319–21.

### b.   Inference of Guilt

Immediately following the above instructions and hypothetical, the judge

instructed regarding an inference of guilt:

And in this instance, you could be asked do you draw a reasonable inference that the defendant did this[?] And in looking at *that question*, you certainly can apply your common sense, your powers of logic.

SA 321 (emphasis added).

### c. Rules Regarding Reasonable Inferences

Thereafter, immediately following the instruction regarding an inference of guilt, the judge further instructed the jury regarding inferences as to elements of the crime as follows:

> *And here are the rules for drawing a reasonable inference. One, you can only draw a reasonable inference from evidence that you believe. Two, that inference has to be reasonable. In other words, it can't be a guess. Three, that where the inference constitutes an element of the crime—intent. Intent, which I told you can well be the subject of circumstantial evidence—it has to be proven beyond a reasonable doubt.*
>
> I say to you that in looking at the drawing of an inference, you twelve people put together the evidence that's relevant to that conclusion that the Commonwealth wants you to draw. The defendant may ask you to draw an inference. See what's relevant. See of that relevant evidence what you believe, and then follow the three rules that I just listed.

SA 321–22.

### d. Reasonable Doubt Instructions

Finally, after the above challenged instructions and near the conclusion of the instructions, the judge instructed the jury regarding reasonable doubt as follows:

> Proof beyond a reasonable doubt. Remember that logical staircase? Go through those steps. Go through the examination of what's believable from what is not. Go through the question of whether or not you can draw reasonable inferences. And ask yourself, "All right. We've determined that evidence." Then ask yourself another question. "To what degree do we believe it?" Because it has to be proof beyond a reasonable doubt.
>
> Then what is reasonable doubt? It is a term often used, probably pretty well understood, but not easily defined. It is not mere possible doubt, because everything relating to human affairs and depending on evidence is open to some possible or imaginary doubt. It is that state of the case which, after the entire comparison and consideration of all the evidence, leaves the minds of the jurors in that condition that they cannot say they feel an abiding conviction to a moral certainty of the truth of the charge.

> The burden of proof is upon the prosecutor. All presumptions of law independent of evidence are in favor of innocence, and every person is presumed to be innocent until proven guilty. If upon such proof, there is reasonable doubt remaining, the accused is entitled to the benefit of it by an acquittal. For it is not sufficient to establish a probability, though a strong one arising from the doctrine of chances, that the fact charged is more likely to be true than the contrary. But the evidence must establish the truth of the fact to a reasonable and moral certainty, a certainty that convinces and directs the understanding and satisfies the reason and judgment of those who are bound to act conscientiously upon it. This we take to be proof beyond a reasonable doubt.

SA 326–28.

### ii.   SJC Proceedings and Analysis

Petitioner argued to the SJC that the above instructions (i)–(iii) were erroneous for three reasons, including that they: (1) were unfairly unbalanced in favor of the Commonwealth and employed the hypothetical to explain to the jury how it could infer guilt—but not innocence—from circumstantial evidence, thus creating a "roadmap as to how the jury could put together the chain of circumstantial evidence . . . to find [Petitioner] guilty," SA 74–76; (2) improperly suggested to the jury that it could make a "reasonable" inference as to Petitioner's guilt, thus relieving it of its burden of proof to find guilt beyond a reasonable doubt, *id.* at 77–78; and (3) improperly lowered the prosecution's burden of proof regarding the elements besides intent, *id.* at 78–79. The Court turns to each of the sub-issues, addressing the SJC proceedings and its determinations as to each.

### a.   Unbalanced Nature of Instruction/ "Roadmap" to Guilt

As noted, Petitioner argued that instruction (i), the hypothetical regarding direct and circumstantial evidence, was unfairly unbalanced in favor of the Commonwealth because it explained to the jury how it could infer guilt—but not innocence—from the

circumstantial evidence, thus creating a "roadmap as to how the jury could put together

the chain of circumstantial evidence . . . to find [Petitioner] guilty," SA 74–76 (citing

*United States v. Dove*, 916 F.2d 41, 47 (2d Cir. 1990) ("[T]he use in a criminal case of a

hypothetical that assumes guilt where the defendant asserts his innocence is disfavored.")).

Petitioner asserted that, in effect, the hypothetical "explain[ed] precisely how the jury

could follow a chain of reasoning very much like the chain of reasoning they would have

to follow to find [Petitioner] guilty—while offering no suggestion that the result of that

chain of reasoning could end in anything other than a finding of guilt."  SA 76.

Accordingly, Petitioner argued that the instruction was neither fair nor impartial, and that

it lowered the Commonwealth's burden of proof.  *Id.*

 Respondent countered in the state court that the SJC's prior decision in a case

involving the same trial judge and a similar hypothetical, *Commonwealth v. Silva*, in

which the SJC concluded there was no error and "no substantial likelihood of a

miscarriage of justice," was applicable to and dictated the same result in this case.  SA

374–76 (quoting 121 N.E.3d 1266, 1277 (Mass. 2019)).

 At oral argument, the SJC ordered the Petitioner to further brief the issue.  SA

419–20.  In a subsequent supplemental brief, Petitioner contended that this case was

distinguishable from the *Silva* case because, here, Petitioner identified "seven distinct

erroneous instructions" in contrast to the "single" erroneous instruction in *Silva*.  *Id.*

 Regarding Petitioner's argument that the instruction was unbalanced, the SJC

acknowledged that multiple federal circuit courts have discouraged the use of unbalanced

or "one-sided jury instructions."  SA 482 (citing *United States v. Hensley*, 982 F.3d 1147,

1161 (8th Cir. 2020) (finding unbalanced hypothetical was not error but "discourag[ing]

the use of such one-sided jury instructions"); *United States v. Salameh*, 152 F.3d 88, 142–143 (2d Cir. 1998), *cert. denied*, 526 U.S. 1028 (1999) (noting unbalanced hypotheticals were "disfavored," but did not constitute prejudicial error); *Dove*, 916 F.2d at 46 (holding that trial judge used unbalanced hypothetical that "merely instructed [the jury] how to look for evidence of . . . guilt," to explain the difference between direct and circumstantial evidence, which constituted reversible error)).  The SJC also acknowledged that in its decision in *Silva*, it had declined to explicitly address the "unbalanced" nature of the hypothetical instruction in that case, instead admonishing that in future cases, "it is better practice to avoid examples in which hypothetical individuals commit crimes."  SA 482 (quoting *Silva*, 121 N.E.3d at 1279, and citing *Dove*, 916 F.2d at 46).  The SJC then stated that it was "hold[ing] the same here," thus declining to conclude that the "unbalanced" nature of the hypothetical itself rendered the instruction erroneous—but, instead, as in *Silva*, simply "discouraging" the use of such hypotheticals in the future.  SA 482.

Turning to Plaintiff's argument that the hypothetical instruction constituted a "roadmap" to his guilt, the SJC again acknowledged that it had not addressed that same issue in *Silva*.  SA 483.  The SJC then found that the hypothetical in this case was more problematic than the one at issue in *Silva* because the hypothetical here was "far more similar to the facts of [Petitioner's] case" than the *Silva* instructions or those in other cases "objected to on similar grounds."  *Id.* (comparing hypothetical here to hypotheticals in *Commonwealth v. Shea*, 496 N.E.2d 631 (Mass. 1986), *Commonwealth v. Gil*, 471 N.E.2d 30 (Mass. 1984), and *Commonwealth v. Vaughn*, 590 N.E.2d 701 (Mass. Ct. App. 1992)).  The SJC went on to distinguish its decisions in the prior cases, including *Silva*, in which it

had held that similar instructions were not erroneous because they did not improperly

lessen or shift the burden of proof.  SA 483 (discussing *Silva*, 121 N.E. 3d at 1276).

In concluding that the hypothetical in this case was erroneous, the SJC noted that

"[h]ere, the hypothetical closely mirrored the circumstances of [Petitioner's] case and

arguably served to emphasize the prosecution's theory of the case, illustrating to the jurors

how they could find [Petitioner] guilty."  SA 483.

The SJC ultimately held that the hypothetical was erroneous and that,

"[c]onsequently, [Petitioner's] trial counsel was ineffective for failing to object."  SA 483.

The SJC nevertheless held that the error was not prejudicial for five reasons, two of which

related to other instructions given by the trial judge, including:  (1) the trial judge's

clarification "that the jury could not premise a verdict on speculative inferences," SA 483

& n.22 (citing judge's instruction at SA 321, in which the judge advised jury:  "One, you

can only draw a reasonable inference from evidence that you believe.  Two, that inference

has to be reasonable.  In other words, it can't be a guess."); and (2) the trial judge's

statement that the jury "should not take anything he had said to demonstrate his view on

the case, and that if he had done so unintentionally, they should disregard it."  SA 483 &

n.23 (citing *Hensley*, 982 F.3d at 1160–61, along with judge's other instruction, SA 326,

noting that he was "neutral" and to "disregard" any suggestion that he "ha[s] a view of this

case").  Additionally, the SJC reasoned that:  (3) the trial judge's hypothetical did not

infringe on his instructions regarding reasonable doubt; (4) its review of the entire record

demonstrated that "the judge was scrupulously focused on [Petitioner] receiving a fair

trial;" and (5) "the Commonwealth's case against [Petitioner was] strong, and thus any

error was likely not to have influenced the jury's verdict."  SA 483.

Again, the appropriate inquiry for this Court in reviewing the SJC's determination as to prejudice is whether "'fairminded jurists' would all agree" that the SJC's determination that there was no reasonable probability that the result of the proceeding would have been different had counsel objected to the challenged instruction was itself an unreasonable application of clearly established federal law. *See Jewett*, 634 F.3d at 75 (quoting *Harrington*, 562 U.S. at 101–02); *see also Harrington*, 562 U.S. at 104–05 (quoting *Strickland*, 466 U.S. at 694).

In his briefing before this Court, Petitioner argues that the SJC unreasonably applied clearly established law when it found there was not a "substantial likelihood of a miscarriage of justice."[21]  ECF No. 19 at 25–26.  Petitioner further contends that the SJC's finding that the case against him was "strong" was unreasonable and that the SJC ignored his testimony, which "[i]n reality, . . . 'if credited by a jury would [have] defeat[ed] an essential element of the crime.'"  *Id.* at 26 (citing *United States v. Miller*, 891 F.3d 1220, 1237 (10th Cir. 2018)).  He asserts that the jury instruction errors "denigrated his credibility [and] privileged his statement to police over his trial testimony," noting that his first trial resulted in a hung jury.  *Id.* at 26.  He thus argues that it was unreasonable for the

---

[21] Petitioner argues that the SJC "failed to examine the effect of the instruction in the context of the instructions and the trial evidence as a whole," including, specifically, Petitioner's testimony.  ECF No. 19 at 25.  Although Petitioner attempts to frame this as a prejudice-related argument, he confuses the standards for establishing instructional error and prejudice.  *Id.*  Petitioner cites to *Estelle*, 502 U.S. at 72, in arguing that the SJC "failed to examine the effect of the instruction in the context of the instructions and trial evidence as a whole."  *Id.*  However, *Estelle* and the standard cited by Petitioner pertain to the establishment of instructional error—not prejudice.  *See Calderon*, 525 U.S. at 147 (holding the first test "does not inquire into the actual effect of the error on the jury's verdict; it merely asks whether constitutional error has occurred").

SJC to "assume that a jury properly instructed as to evaluation of credibility and the proper use of evidence" would have rejected his testimony. *Id.*

Respondent counters that the SJC's evaluation of the strength of the government's case was reasonable. ECF No. 29 at 27. In support, Respondent notes the following evidence: Petitioner's admission to being in the victim's apartment on the night of the murder and the existence of an altercation with the victim; Petitioner's inability to identify the other man he alleged was present; Petitioner's inconsistent statements during his initial interview with law enforcement; and the existence of the victim's blood on Petitioner's shoes and on a t-shirt and pack of cigarettes located inside his backpack. *Id.* at 27–28.

In reply, Petitioner reiterates that his testimony, "if believed, explained all of the circumstantial evidence presented by the government" such that it was unreasonable for the SJC to label the case against him as "strong." ECF No. 25 at 6. In support, he contends that his "testimony explained his reason for being in the [victim's] room, that he had gotten into a bloody fistfight with the victim, and that there was another man in the room when he left." *Id.*

Again, for the reasons discussed regarding the other challenged jury instruction above, the SJC's determination that Petitioner was not prejudiced by the erroneous hypothetical based in part on the strength of the case was neither an unreasonable application of nor contrary to clearly established federal law. Moreover, the SJC's related determination that the trial judge's additional reasonable doubt instructions—along with his instructions prohibiting speculative inferences and admonishing the jury that he was "neutral"—mitigated any prejudice caused by the erroneous hypothetical also did not constitute an unreasonable application of clearly established federal law.

b.  Inference Regarding Petitioner's Guilt

Petitioner additionally argues IAC based on his counsel's failure to object to the

judge's statement immediately following the hypothetical, in which the judge advised:

> And in this instance, you could be asked do you draw a reasonable
> inference that the defendant did this[?] And in looking at that question,
> you certainly can apply your common sense, your powers of logic.

SA 321.

Petitioner argued to the SJC that the above instruction applied not to the

hypothetical the trial judge had just propounded, but to the jury's deliberations in the case

at hand.  *See* SA 77 n.18 (arguing that "[i]f there is any question that the first sentence

referred to the case at bar and not the hypothetical just propounded, the second sentence,

which tells the jury to use their common sense and logic, makes clear the [judge] [was]

referring to their deliberations in this case").  In support, he contended that the jury "likely

underst[ood] the first sentence to be instructing them that any inference they might draw

of [Petitioner's] guilt would be a 'reasonable one.'"  *Id.* at 77.  As such, Petitioner argued

the instruction "invaded the province of the jury by directing them as to which inferences

[were] 'reasonable'" and lowered the Commonwealth's burden of proof.  *Id.* at 77–78

(citing *In re Winship*, 397 U.S. at 364, and *United States v. DeLoach*, 504 F.2d 185, 190

(D.C. Cir. 1974)).

Respondent countered that the above instruction simply advised the jury that they

"could be asked" to draw an inference prior to "outlin[ing] the rules that limit[ed] the

range of permissible inferences."  SA 377.  Respondent then cited to the SJC's prior

decision in *Silva*, and argued that there was no instructional error.  *Id.* at 377–78.

Unlike the hypothetical instruction discussed above, the SJC did not make an explicit

finding as to whether this instruction was erroneous and/or whether counsel's performance

in failing to object to it was deficient.  SA 484 (noting "we have made our concerns with the hypothetical clear").  Instead, the SJC simply found that it did "not think this closing element" to the erroneous hypothetical "created a substantial likelihood of a miscarriage of justice."  *Id.*  While acknowledging that the language "may have subtly implied that such an inference [of guilt] would be reasonable," the SJC nevertheless suggested there was no instructional error because "a reasonable jury" would not have interpreted the instruction as "conclusive[ly] direct[ing]" it to make such an inference.  *Id.* (quoting *Commonwealth v. Skinner*, 556 N.E.2d 1014, 1018 (Mass. 1990)).  In support, the SJC distinguished Petitioner's case from another Massachusetts case in which a challenged instruction constituted a "conclusive direction by [the judge] to find murder in the first degree once the jury were convinced of the [underlying] facts."[22]  *Id.* (citing *Skinner*, 556 N.E.2d at 1018).

---

[22] In *Skinner*, distinguished by the SJC here, the petitioner/defendant was convicted of murder in the first degree and illegally carrying a firearm.  556 N.E.2d at 1016.  The judge responded in *Skinner* to a jury question asking whether there were any circumstances other than "self-defense or authorized killing" in which a person could "aim a gun with the intention of killing without premeditation?"  *Id.*  In particular, the jury asked whether "cocking and aiming a gun constitutes[s] premeditation?"  *Id.*

The judge responded with the following instruction:

The answer to your question is the process of cocking and aiming a gun can constitute premeditation if it is followed by an act which is performed with the intent to kill, or to create a plain and strong likelihood that death or grievous bodily harm would follow, or to do grievous bodily harm.  Put another way, the cocking and aiming in a vacuum, as it were, does not constitute anything, but if the cocking and aiming is followed by a firing of the gun with the intent to kill, or to create a plain and strong likelihood that death or grievous bodily harm would result, or to do grievous bodily harm, then the set of facts found by the jury beyond a reasonable doubt would constitute first-degree murder.

In his federal habeas briefs, Petitioner did not address each of the challenged instructions separately as he did before the SJC. *See* ECF No. 19 at 24–26; *cf.* SA 73–79. Respondent also did not address this instruction in his federal habeas brief. ECF No. 29 at 24–25.

The SJC's implicit suggestion that there was no instructional error was not an unreasonable application of or contrary to clearly established federal law. Here, the challenged instruction operated neither as a mandatory presumption nor as a tool to shift the Commonwealth's burden of proof. *See Sandstrom*, 442 U.S. at 520–24; *Patterson*, 432 U.S. at 215 ("[A] State must prove every ingredient of an offense beyond a reasonable doubt and . . . may not shift the burden of proof to the defendant by presuming that ingredient upon proof of the other elements of the offense"). Contrary to the Petitioner's suggestion, the instruction—and the question contained therein—appear designed to emphasize that the trial judge's preceding hypothetical constituted one example of a situation in which a jury might be asked whether it drew a reasonable inference from the circumstantial evidence of the defendant's guilt. Notably, the first sentence was phrased as a question, asking the jury, "do you" draw a reasonable inference? SA 321. This fact alone suggests that the instruction was not mandating or "conclusively directing" the jury

---

*Id.* at 1015–16.

The *Skinner* petitioner argued that the instruction improperly collapsed the element of premeditation into the distinct element of malice. *Id.* at 1016. The SJC agreed, holding that the instruction violated the petitioner's due process rights under *Sandstrom* because it relieved the government of its burden of proving premeditation when "[t]he judge informed the jury, not only that they *could* infer premeditation from certain subsidiary facts and malice, but that the finding of those facts and malice '*would* constitute first degree murder.'" *Id.* at 1017.

to draw an inference.  That remains the case even if the instruction could have been interpreted by the jury to apply to the case at hand, as opposed to the judge's preceding hypothetical.  Moreover, as Respondent noted, the instruction also served to introduce the trial judge's subsequent instruction regarding the rules governing inferences.

Furthermore, for all the reasons discussed with the other jury instructions above, the SJC's determination that this instruction did not create "a substantial likelihood of a miscarriage of justice" must by this Court be interpreted as a determination that there was also no prejudice under *Strickland*.  Again, given the Court's prior discussion regarding the strength of the Commonwealth's case, that implicit SJC determination was also not an unreasonable application of or contrary to clearly established federal law.

c.  Impact on Government's Burden of Proof

Petitioner additionally argues that the related instruction italicized below improperly lowered the prosecution's burden of proof regarding the elements besides intent:

> *And here are the rules that apply to drawing a reasonable inference. One, you can only draw a reasonable inference from evidence that you believe.  Two, that inference has to be reasonable.  In other words, it can't be a guess.  Three, that where the inference constitutes an element of the crime—intent.  Intent, which I told you can well be the subject of circumstantial evidence—it has to be proven beyond a reasonable doubt.*
>
> I say to you that in looking at the drawing of an inference, you twelve people put together the evidence that's relevant to that conclusion that the Commonwealth wants you to draw.  The defendant may ask you to draw an inference.  See what's relevant.  See of that relevant evidence what you believe, and then follow the three rules that I just listed.

SA 321–22 (emphasis added).

Petitioner argued to the SJC that the challenged instruction, in identifying only one element of the crime—intent, implied that there were no other elements that the

Commonwealth was required to prove beyond a reasonable doubt standard.  SA 78–79.

According to Petitioner, this included the identity of the murderer, which he asserted was

*the* central issue at trial.  *Id.* at 79.

Respondent countered that "the context" of the instruction made it "clear" to the

jury that the judge was merely using "intent as an example of an element that he had

already described."  SA 379.  In support, Respondent pointed to the judge's other

"thorough" instructions regarding the elements of the crime, *id.* at 300–17; the judge's

other instruction regarding the factual questions before the jury, *id.* at 318;[23] another

instruction to the effect that the jury could only use evidence of Petitioner's "other

violation of law" only "for the limited purpose of determining whether or not it sheds light

on why the murder was committed or who committed it," *id.* at 324; and the judge's

reiteration that the prosecution's burden of proof was beyond a reasonable doubt.  *Id.* at

329.  Respondent thus argued that the trial judge clearly did advise the jury that

"determining whether [Petitioner] was the killer would be central to their consideration[]

of his guilt."  *Id.* at 379.

The SJC rejected Petitioner's argument, holding that there was no instructional

error because "a reasonable juror would have understood the challenged instruction to

show that intent is one example of an element that must be proved beyond a reasonable

doubt, not that it was the only one."  SA 484.  In making that determination, the SJC

"[l]ook[ed] at the jury instructions as a whole," and found that the judge properly

---

[23] This refers to the first challenged instruction discussed above.  *See* SA 318.

"outlined the elements of each charged crime" and "instructed . . . that proof beyond a reasonable doubt [was] necessary for every element." *Id.*

Again, in his federal habeas briefs, Petitioner failed to address this challenged instruction separately, as he did in his brief before the SJC. *See* ECF No. 19 at 24–26; *cf.* SA 73–79. Respondent also did not separately address the instruction in his federal habeas brief. ECF No. 29 at 27–28.

The SJC's determination that there was no instructional error based on its review of the instructions as a whole was a reasonable application of clearly established law. As noted previously, the judge accurately instructed the jury regarding the elements required for the Commonwealth to prove beyond a reasonable doubt first degree murder by atrocity or extreme cruelty. The challenged instruction did not undermine or negate these other instructions.

In sum, for the reasons above, the SJC's evaluation of Petitioner's IAC claim based on the challenged hypothetical and instructions regarding direct and circumstantial evidence and reasonable inferences was neither contrary to nor an unreasonable application of clearly established federal law.

4. Instructions Regarding Witness Credibility

Petitioner next argues that he received ineffective assistance of counsel when his trial counsel failed to object to a series of three jury instructions related to witness credibility, which he claims violated his Due Process and Sixth Amendment rights. ECF No. 19 at 20.

i.   Relevant Instructions

Prior to giving the challenged witness credibility instructions, the trial judge

explained to the jury how to view the defendant's testimony as follows:

> Now, bear in mind, jurors, the defendant testified. And you look at his
> testimony the same way as any other witness. He gets no favor. He
> gets no disadvantage. But his testimony is viewed by you under the
> lens of the tools you're going to bring to bear on credibility.

SA 301–02.

The judge then explained to the jury their authority over the evidence generally in

pertinent part:

> Evidence. This jury has full authority over the evidence. And think of
> it this way. These are the choices that you can make. You can have an
> exhibit or you can have a witness before you, and now it comes time to
> judge whether or not that witness' words are believable, whether you
> believe that witness. You're not limited to yes or no. Of course you
> can say, "I don't believe a word of it." You can say, "I believe all of it."
> But jurors, you're also entitled to say, "I believe some of it. I don't
> believe other parts." That's your choice.

SA 317.

Subsequently, the judge advised the jury that he would provide them "some tools"

to help them "properly engage in a good due deliberation." SA 318.

Thereafter, the judge gave the first challenged instruction regarding witness interest and

bias, italicized and set forth below as instruction (a).

> Credibility, jurors. What do we mean by that? You know about it. Sure,
> you do. You use it in your everyday affairs. Think about this. Do
> people come up to you and tell you to believe something? Ask you to
> say yes? And it's something that you want to think about. What do you
> do? What's the first thing? Well, you're watching the person. Sure,
> you are. You want to figure out from your common sense whether or
> not this person is believable. So you're watching demeanor. You're
> also listening carefully to the words and asking yourself he just said
> that, but then he said this, and those two don't make sense. If he said
> this, then that doesn't follow. You're listening to him to see whether
> this is double talk, or sales talk, or this is the genuine article. Three,

you're thinking what's in it for him or her. Is there bias? Is there self interest? All of that comes into play. So you are in a sense evaluating all the time in your lives believability. And I say to you that you're going to use essentially those same tools when you go into that jury room, and you use your common sense and life's experiences to decide this.

You're going to be asking about consistency. You're going to ask yourself about coherency. Does it appeal to common sense and logic? And you're going to ask yourself about how it was presented, and you will also ask yourself about bias or interest. *(a) And bear this in mind. The defendant has a bias. He has an interest. So do the police. So do the police. Anyone who works for an agency that's involved in the case has a bias. So don't think the only person with a bias is the defendant, because that's not so.*

SA 322–23 (emphasis added).

The trial court then instructed the jury as follows regarding the relationship between witness testimony and exhibits in the second challenged instruction (b):

Now, there's another way to look at credibility. Say to yourself, you know, I believe something in those exhibits. And you know what? What's in those exhibits backs up this witness. That's called corroboration. *(b) If, on the other hand, the exhibit contradicts the witness, what do you use that for? A reason not to believe a witness.*

SA 322–23 (emphasis added); *see also id.* at 481.

Several instructions later, after instructing the jury regarding its consideration of testimony from fact and opinion witnesses, the trial judge gave the third challenged instruction (c) regarding the video recording of Petitioner's initial police interview, advising:

*(c) You've got a video, jurors. You've got a video of what the interview consisted of at the Attleboro police station. That's going to be given to you. You're going to have the ability to play it. Indeed, you should be controlled by it. What he said on the video, you're going to see. You're going to see it. If it conflicts with what the lawyers said he said, you're going to follow the video.*

SA 326 (emphasis added); *see also id.* at 482.

The Court addresses below the three challenged instructions.

74

ii.  Bias/Interested Witness Instruction

a.  SJC Proceedings

Petitioner argued that instruction (a) above inferred that he was biased, thus

violating his Sixth Amendment right to have a jury decide every issue of fact.  SA 69.  He

contended that it "denigrated [his] credibility" and "infring[ed] on his right to testify [on]

his own behalf, and to offer evidence in his defense."  *Id.* (citing *Rock v. Arkansas*, 483

U.S. 44, 51–53 (1987)).

Respondent countered that, based on state law, the trial judge was permitted to

mention the Petitioner's interest and "could subject his testimony to the same

considerations of credibility as any other witness."  SA 368–69 (citing *Commonwealth v.*

*Ramos*, 577 N.E.2d 1012, 1016 (Mass. Ct. App. 1991) ("It is appropriate for a judge to

mention that interest in the case is a criterion, along with others which the judge detailed,

for assessing the credibility of witnesses."), and *Commonwealth v. Perez*, 455 N.E.2d 632,

636 n.3 (Mass. 1983) (instructing the jury, "You are entitled to weigh this evidence, this

testimony of the defendant, and you are entitled, of course, in weighing the testimony of

the defendant, to consider, if you see fit, the interest of the defendant in the outcome of the

case which is before you.")).

The SJC acknowledged that the trial judge "should not have stated 'the [Petitioner]

has a bias,'" but nevertheless held that, based on state law, it was not instructional error

because "taken in context[,] the comment did not communicate to the jury the judge's own

opinion regarding the [Petitioner's] credibility."  SA 481 (citing *Perez*, 455 N.E.2d at 639).

In support, the SJC also noted that the challenged instruction was accompanied by a

reminder that law enforcement also had a bias.  *Id.*  It distinguished the trial judge's

instruction from that involved in the First Circuit's decision in *United States v. Rollins*, holding that, here, this was "not a case" where Petitioner's "bias was 'singled out for special comment.'" *Id.* (quoting 784 F.2d 35, 37 (1st Cir. 1986) (advising jury that they may consider "if [the defendant's] interest may create a motive for the giving of false testimony")).

As for Petitioner's argument that the judge's instruction failed to inform the jury that bias "did not necessarily mean he was not testifying truthfully," SA 69, the SJC again acknowledged that "it would have been preferable for the judge to state [that it 'may well find' Petitioner's testimony 'to be truthful']." SA 481 n.20 (citing *United States v. Gleason*, 616 F.2d 2, 15 (2d Cir. 1979)). Nevertheless, the SJC found no error given the judge's "illustration about how one evaluates credibility in one's everyday life, stat[ing], 'you're thinking what's in it for him or her. Is there bias? Is there self interest? All of that comes into play.'" *Id.* The SJC reasoned that this portion of the instruction advised the jury "that bias is but one of many factors to be evaluated in determining credibility, in addition to, among others, the person's demeanor and word choice." *Id.*

Based on the above, the SJC ultimately found that "trial counsel's failure to object did not amount to a substantial likelihood of a miscarriage of justice." SA 481. The SJC nevertheless admonished that "utmost care is required when instructing the jury about a defendant's testimony" because "[e]ven an unintended suggestion by the judge that the defendant's testimony is subject to greater scrutiny risks error." *Id.*

                          *b.* Instructional Error/Deficient Performance

                          1. Legal Standards

Clearly established Supreme Court law establishes that due process requires that a criminal defendant have the right "to a fair opportunity to defend against the State's

accusations." *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973); *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006) ("Whether rooted directly in the Due Process Clause of the Fourteenth Amendment or in the Compulsory Process or Confrontation Clauses of the Sixth Amendment, the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" (quoting *Crane v. Kentucky*, 476 U.S. 683, 690 (1986))). The right to present a defense, however, is not unfettered. *See Montana v. Egelhoff*, 518 U.S. 37, 42 (1996). Rather, it is subject to "reasonable restrictions." *United States v. Scheffer*, 523 U.S. 303, 308 (1998).

Clearly established Supreme Court law also protects a criminal defendant's fundamental right to testify (or not) in his own defense based on the Fifth Amendment privilege against self-incrimination, the Due Process Clause, and the Sixth Amendment. *See Rock*, 483 U.S. at 51–53 ("Even more fundamental to a personal defense than the right of self-representation . . . is an accused's right to present his own version of events in his own words. A defendant's opportunity to conduct his own defense by calling witnesses is incomplete if he may not present himself as a witness.").

In a similar vein, Supreme Court precedent has long recognized that a defendant has an interest in the outcome of a trial that is "greater than that of any other witness" and that such an interest may "be suggested by the court to the jury." *See Reagan v. United States*, 157 U.S. 301, 305 (1895) (approving court's instruction that defendant's deep personal interest in outcome should be considered in determining his credibility); *see also Portuondo v. Agard*, 529 U.S. 61, 71–73 (2000) (reiterating its holding in *Reagan,* and noting that *Reagan* "simply set forth a consideration the jury was to have in mind when

assessing the defendant's credibility," which the *Portuondo* Court characterized as "a long tradition that continues to the present day").

There are, however, limits on how a defendant's interest in the outcome of a trial may be explained to a jury. *See Hicks v. United States*, 150 U.S. 442, 451–52 (1893) (reversing the lower court and setting aside the verdict where the trial court instructed the jury that the defendant's interest might cause him "to make statements to influence a jury in passing upon our case that would not be governed by the truth" and that the defendant "might be led away from the truth"). In *Hicks*, the Supreme Court held that a judge may not "intimate" to the jury that a defendant's interest in the outcome "deprive[s] his testimony of [truth or] probability." *Id.* at 452.

In *Hicks*, the trial court instructed the jury:

> You are to consider [the defendant's] interest in this case, you are to consider his consequent motive growing out of that interest, in passing upon the truthfulness or falsity of his statement. He is in an attitude, of course, where any of us, if so situated, would have a large interest in the result of the case; the largest, perhaps, we could have under any circumstances in life; and such an interest, consequently, as might cause us to make statements to influence a jury in passing upon our case that would not be governed by the truth. We might be led away from the truth because of our desire.

150 U.S. at 451.

The Supreme Court held that the above instruction, in combination with other erroneous instructions, constituted reversible error, reasoning:

> Still it must be remembered that men may testify truthfully, although their lives hang in the balance, and that the law, in its wisdom, has provided that the accused shall have the right to testify in his own behalf. Such a privilege would be a vain one if the judge, to whose lightest word the jury, properly enough, give a great weight, should intimate that the dreadful condition in which the accused finds himself should deprive his testimony of probability.

150 U.S. at 452 (noting, however, that it was "not easy to say what effect [the interest/bias] instruction had upon the jury," and that if it "were the only objectionable language contained in the charge, [the Court] might hesitate in saying it amounted to reversible error").

A defendant's presumption of innocence is also clearly established federal law. *See Coffin v. United States*, 156 U.S. 432, 453 (1895). In *Estelle v. Williams*, the Supreme Court explained: "To implement the presumption [of innocence], courts must be alert to factors that may undermine the fairness of the fact-finding process. In the administration of criminal justice, courts must carefully guard against dilution of the principle that guilt is to be established . . . beyond a reasonable doubt." 425 U.S. 501, 503 (1976).

In addition to the Supreme Court law set forth above, Petitioner and the SJC reference several First and Second Circuit cases, in which the courts expressed disapproval of jury instructions that highlighted a defendant's personal interest in the outcome. *See* SA 69 (citing *Gleason*, 616 F.2d at 21); ECF No. 19 at 21 (citing *United States v. Gaines*, 457 F.3d 238, 245, 248 (2d Cir. 2006) (discussing *United States v. Dwyer*, 843 F.2d 60, 63 (1st Cir. 1988), and *Rollins*, 784 F.2d at 37)).

In the first of the four cases, *United States v. Gleason*, the defendants/appellants, former officers of a national bank, were convicted following a jury trial of making false entries in bank records with the intent to defraud and conspiring to commit fraud. *See* 616 F.2d at 9. The trial judge in *Gleason* instructed the jury that "the Government is frequently out of necessity required to rely on participants, accomplices, and persons who have committed crimes including perjury, as witnesses and that 'you [the jury] must view these witnesses with particular caution and scrutinize them with particular care.'" *Id.* at

15.  The judge then noted that the defendant "'ha[d] a deep personal interest in the result of this prosecution' and 'the greatest kind of stake in its outcome' which 'create[d], at least potentially, a motive for false testimony' and 'is of a character possessed by no other witness.'"  *Id.*  The judge then utilized a "boiler-plate" instruction, advising the jury that

> 'it by no means follows that simply because a person has a vital interest in the end result of a case he is not capable of telling a truthful, candid, and straight-forward story' and that it was for the jury, after weighing these factors, and giving 'the most careful and fair consideration to the testimony of each defendant and to the factors which . . . could weigh for or against its credibility' to determine its credibility.

*Id.* at 15–16.

The *Gleason* appellants argued that the instructions "precluded a balanced assessment of the witnesses' credibility because [the instructions] failed adequately to warn [the jury] of the inherently suspect nature of the accomplices called by the Government."  616 F.2d at 15.  The Second Circuit disagreed, but nevertheless admonished that

> [A] court should not emphasize the suspect nature of the testimony of certain witnesses without pointing out that they may be believed. Although a trial judge has the right to comment on credibility of specific witnesses, this right is limited and its exercise is appropriate only when necessary to assist the jury.  Confidence in our jury system leads us to leave credibility solely to the jury which, as the conscience of the community, is expected to act with sound judgment.

*Id.* (citation omitted).  The *Gleason* court ultimately held that there was no error because the instructions were sufficiently balanced, and, viewed in their entirety, were "neither unfair to the appellants nor weighted in favor of the Government's witnesses."  *Id.*

Subsequently, in *Rollins*, where the defendant was charged with numerous drug offenses, the trial judge instructed the jury that the defendant's "interest may create a motive for the giving of false testimony."  784 F.2d at 36–37.  The First Circuit assumed that the instruction constituted error, but that the error was harmless.  *Id.* at 36–38.

The *Rollins* court acknowledged that in 1895, the Supreme Court "approved essentially the [same] charge." 784 F.2d at 37 (citing *Reagan*, 157 U.S. at 301). It noted, though, that in 1895, a defendant's testimony was a "relatively recent event," and that "[s]ince that time, however, the lower courts have been increasingly troubled with the seeming psychological inconsistency of charging in one breath that a defendant is presumed to be innocent, and in the next that his, or her, testimony is peculiarly suspect." *Id.* (citing *Carrigan v. United States*, 405 F.2d 1197, 1198 (1st Cir. 1969) (noting that "it would be best if the defendant were not singled out for special comment")). The First Circuit further noted that it had not gone "to the point of saying" that such an instruction would be "plain error" in its prior decision in *Carrigan*. *Id.* at 37. However, "[f]or the benefit of district courts in the future," the *Rollins* court discouraged such instructions, holding that, "[s]urely a modern jury" did not need such a bias or credibility instruction, especially given that such an instruction "might serve to suggest that the court has a message—don't trust this defendant." *Id.* at 37–38.

Following *Rollins*, in *United States v. Dwyer*, the defendant was tried first among several defendants and convicted of defrauding a federally insurance bank and conspiracy. 843 F.2d at 61. The trial judge in *Dwyer* instructed the jury as follows regarding the defendant's bias and credibility:

> As I told you at the beginning of the case, a defendant cannot be compelled to take the witness stand and testify. Whether or not he testifies is a matter of his own choosing. If he does choose to testify, he is a competent witness in the case. In that event, he is subject to cross-examination and his credibility is for you, the jury, to determine, in the same manner as that of any other witness. Obviously, a defendant has a great personal interest in the result of his prosecution. *The interest gives the defendant a strong motive to lie,* to protect himself. In appraising his credibility, you may take that fact into consideration, however, I want to say to you with equal force, that *it by no means*

> *follows that simply because a person has a vital interest in the trial's end result, that he is not capable of telling a truthful and straightforward story.* It is for you to decide to what extent, if at all, the defendant's interest has affected or colored his testimony. It is for you to weigh his credibility and determine the credibility of his testimony.

*Id.* at 62–63.

The First Circuit acknowledged that the *Dwyer* instruction had "been approved by the Second Circuit" in *Gleason.* 843 F.3d at 63 (citing *Gleason*, 616 F.2d at 15). It nevertheless found the instruction was erroneous based on its own prior decision in *Rollins. Id.* at 63 (asserting that "no United States Attorney familiar with our reversal of the district court in *Rollins* should have even considered filing [the above instruction," and that "no judge familiar therewith would have given it"). The *Dwyer* court reasoned that an instruction "containing denigrating implications should not be given unless it serves some useful purpose or need," and there was "none here." *Id.* The First Circuit also concluded that the *Rollins* instruction's "reflecti[on] on the defendant as a witness was particularly conspicuous when he was the only witness for the defense." *Id.*

In assessing prejudice, the *Dwyer* court suggested that the defendant's testimony denying an intent to defraud the bank, in actuality, "might be said to make [the erroneous instructions] peculiarly prejudicial," noting that "[i]t is hardly consistent for the court to charge the jury as to the presumption of innocence and at the same time indicate doubts about defendant's credibility." 843 F.3d at 64. In conclusion, the First Circuit held that the erroneous bias instruction prejudiced the defendant and then vacated his conviction. *Id.* at 64–65.

Subsequently, in *Gaines,* the Second Circuit addressed approvingly the First Circuit's decision in *Dwyer*, and held that, where the defendant was charged with being a

felon in possession of a firearm, the district court's jury instructions regarding the jury's evaluation of the defendant's testimony were erroneous because they undermined the defendant's presumption of innocence.  457 F.3d at 244–50.  There, the trial judge had instructed the jury, in pertinent part, as follows:

> The defendant in a criminal case never has any duty to testify or come forward with any evidence.  This is because, as I've told you, the burden of proof beyond a reasonable doubt remains on the government at all times, and [the defendant] is presumed innocent.
>
> In this case [the defendant] did testify and he was subject to cross-examination like any other witness.  Obviously, the defendant has a deep personal interest in the result of his prosecution.  This interest creates a motive for false testimony and, therefore, the defendant['s] testimony should be scrutinized and weighed with care.  You should examine and evaluate his testimony just as you would the testimony of any witness with an interest in the outcome of this case.  In appraising the defendant's credibility you may take that into account.
>
> It by no means follows, however, that simply because a person has a vital interest in the end result he is not capable of telling a truthful and straightforward story.  It is for you to decide to what extent, if at all, the defendant's interest has affected or colored his testimony.

*Id.* at 242.

In evaluating the instruction, the *Gaines* court referenced the Supreme Court's prior decisions in *Reagan* and *Hicks*, noting that in 1893 and 1895, when those cases were decided, a defendant's right to testify "was a statutory right of relatively recent vintage." 457 F.3d at 245.  The Second Circuit noted that "[m]ore recently, courts have evaluated challenges to such instructions against the backdrop of the presumption of innocence."  *Id.* (citing *Rollins*, 784 F.2d at 37).  While acknowledging a more recent Supreme Court holding that "a defendant's credibility should be subject to the same scrutiny as the testimony of other witnesses," the Second Circuit held in *Gaines* that "the trial court's jury instructions about a defendant's testimony must not assume that he is guilty."  *Id.* at 246 (citing *Portuondo*, 529 U.S. at 73).

The *Gaines* court suggested that Second Circuit cases previously allowed "similar jury instructions so long as the [defendant's] 'motive to lie' charge [was] 'balanced' by a further instruction that the motive does not the preclude the defendant from telling the truth." 457 F.3d at 246.  It acknowledged that the rule had been "not been easy to administer," and directed district courts in the Second Circuit "to prevent a needless threat of dilution of the presumption of innocence" by not "charg[ing] juries that a testifying defendant's interest in the outcome of the case creates a motive to testify falsely" or "to the effect that a testifying defendant has a deep personal interest in the case." *Id.* at 247.

The Second Circuit subsequently found that the instructional error was harmful, rejecting the prosecution's argument that the evidence was "overwhelming," noting instead that it "boiled down to the credibility of [the defendant's] testimony." *Id.* at 250.

## 2.  Analysis

Petitioner argues in his federal habeas briefs that the SJC's decision in his case was unreasonable because the challenged bias instruction diluted his presumption of innocence, denigrated his credibility, and infringed on his right to testify in his own defense.  In particular, he contends that the SJC's interpretation of the bias instruction as simply "instruct[ing] the jury" that bias was just one criteria for assessing witness credibility was unreasonable.  *See* ECF No. 19 at 21 (citing *Miller-El*, 537 U.S. at 340).  Petitioner counters that the instruction "unambiguously" stated that he was biased, and suggests that regardless of whether the instruction communicated the judge's personal opinion as to his credibility, at a minimum, "it informed the jury that [his] testimony was

biased, and therefore inherently suspect" or "inherently tainted by his interest in the outcome of the case."[24]  *Id.*

Petitioner also suggests that the SJC failed to adequately address whether the instruction violated his federal constitutional rights, including whether it diluted the presumption of innocence, ECF No. 19 at 21 (citing *Gaines*, 457 F.3d at 244–45; *Hicks*, 150 U.S. at 442; *Coffin*, 156 U.S. at 453; and *Estelle v. Williams*, 425 U.S. at 503); interfered with his Sixth Amendment right to testify in his own defense, *id.* (citing *Rock*, 483 U.S. at 51–53); and interfered with his constitutional right have a jury decide every question of fact, *id.* (citing *In re Winship*, 397 U.S. at 364).  *See id.* at 21–22 (quoting *Harrington*, 562 U.S. at 786, for the proposition that the SJC's holding "was so lacking justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement").

Respondent counters that the SJC reasonably determined that the bias instruction was appropriate based on state law.  ECF No. 29 at 21–22.  Respondent does not address Petitioner's argument that the SJC failed to adequately address the issue under federal law, but cites to a district court decision suggesting that an instruction similar to the instruction here did not violate Supreme Court precedent.  *Id.* at 19 (citing *Blake v. Kirkpatrick*, No. 08-cv-09288, 2009 WL 536508, at *3 (S.D.N.Y. 2009)).  Respondent also notes that, here,

---

[24] Petitioner also argues that based on review of the instructions as a whole, including the immediately following instruction regarding credibility, "it is clear" that the judge himself thought Petitioner was "winking at the oath."  ECF No. 19 at 21 n.5 (citing SA 323).

the judge cautioned the jury that all parties had a bias or interest in the case—not just Petitioner. *Id.* at 22.

Respondent then suggests that the SJC reasonably concluded there was no instructional error and/or deficient performance.[25] ECF No. 29 at 22–23. First, Respondent contends that the SJC correctly determined that the instruction and comment did not suggest that the judge personally believed Petitioner was biased. *Id.* Second, Respondent argues that a review of the additional presumption of evidence instruction and the instructions regarding burden of proof and authority over evidence supported the SJC's determination. *Id.*

The Court disagrees with Petitioner that the SJC's determination that the challenged instruction "showed that bias [was] one of many factors to be evaluated in determining credibility, in addition to, among others, the person's demeanor and word choice" was unreasonable. It was reasonable for the SJC to make that determination viewing the challenged instruction as a whole and in distinguishing the instruction here from the instructions given in *Gleason.*

Nevertheless, that fails to address the broader issue here: whether the SJC's determination that the instruction was not erroneous—and that, accordingly, trial counsel was not deficient in failing to object—constituted an unreasonable application of or was contrary to clearly established federal law. At the outset, the Court disagrees with

---

[25] The Court notes that Respondent mistakenly refers to portions of this argument and the SJC's relevant findings as a "prejudice" issue when, in fact, the analysis pertains to the existence of error.

Petitioner that the SJC failed to adequately address the impact that the challenged instruction had on his federal constitutional rights.

Petitioner overlooks both the context for the instructional error arguments—which themselves form the underlying basis for Petitioner's IAC claim, as opposed to a standalone instructional claim—and the SJC's related ruling on the IAC claim.  Here, the SJC both implicitly and explicitly found no instructional error.  First, the SJC explicitly found that "trial counsel's failure to object [to the bias instruction] did not amount to a substantial likelihood of a miscarriage of justice," SA 481, which this Court is required to construe to as a finding of no deficient performance under *Strickland*, even if that is not expressly stated, *Walker*, 911 F.3d at 636; *see also Zuluaga*, 585 F.3d at 30.  Second, although the SJC did not explicitly address each of the Supreme Court cases cited by Petitioner, it cited to and distinguished the First and Second Circuit's decisions in both *Gleason* and *Rollins*—cases that themselves discussed the relevant Supreme Court decisions and that also were cited by and addressed the very issues raised by Petitioner. SA 481 & n.20.

Given these facts, the AEDPA requires this Court to presume that the SJC addressed the issues on the merits.  *See Harrington*, 562 U.S. at 99 ("When a federal claim has been presented to a state court and the court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary."); *Montanez*, 2014 WL 949602, at *3. Regardless, even to the extent that the SJC's decision here may be considered "unaccompanied by an explanation, [Petitioner's] burden still must be met by showing

there was no reasonable basis for the [SJC] to deny relief." *Harrington*, 562 U.S. at 98–100.

Here, it is Supreme Court precedent that governs this Court's federal habeas review of the SJC's decision. *See Brown v. Davenport*, 596 U.S. at 136; *Parker v. Matthews*, 567 U.S. at 48–49. Neither the Supreme Court nor the First Circuit have addressed whether *Rollins* and *Dwyer*, both direct appeals, should be considered by district courts adjudicating federal habeas petitions to constitute "clearly established federal law." Given this absence of First Circuit guidance, the Court finds persuasive other district court decisions that have held that the Second Circuit's similar decisions in *Gleason* and *Gaines* are not representative of "clearly established" Supreme Court law. *See Rodriguez v. Brown*, No. 11-cv-01246, 2011 WL 4073748, at *4–6 (E.D.N.Y. Sept. 13, 2011); *Wilson v. Bradt*, No. 13-cv-06937, 2014 WL 4116960, at *13 (S.D.N.Y. Aug. 20, 2014).

As discussed in detail above, "the relevant Supreme Court precedents on the subject of interested witness instructions find no error in jury instructions calling attention to a defendant's interest in the outcome of a trial as a factor bearing on credibility, so long as the instruction does not imply that the defendant has been untruthful in his testimony." *Blake*, 2009 WL 536508, at *3 (discussing *Reagan*, 157 U.S. at 305; *Hicks*, 150 U.S. at 451–52). Accordingly, given the language of the instructions in this case, the SJC's determination here was neither an unreasonable application of nor contrary to clearly established Supreme Court law.

The Court, however, notes that its conclusion regarding the SJC's decision would not change even *if* the First Circuit's holdings in *Rollins* and *Dwyer* regarding interested

defendant jury instructions could be considered "clearly established federal law."  That is because, unlike *Rollins* and *Dwyer*, the trial judge here did not tell the jury that Petitioner had a motive to lie or provide false testimony.  *See* SA 301–02, 323; *cf. Dwyer*, 843 F.2d at 62–63 (advising the jury that the defendant's "great personal interest in the result of his prosecution . . . gives the defendant a strong motive to lie"); *Rollins*, 784 F.2d at 36–37 (telling the jury that the defendant's "interest may create a motive for the giving of false testimony").  Instead, the judge noted that Petitioner had an interest or bias, but, as the SJC correctly noted, also balanced it with a statement that law enforcement had an interest, too, and that bias was but one of several factors to consider in evaluating credibility.  *See* SA 323.

For all of these reasons, the SJC's determination that counsel's failure to object to the bias instruction was not deficient was neither an unreasonable application of nor contrary to clearly established federal law.

### *c.* Prejudice

Finally, for the same reasons as the other jury instructions above, the SJC's determination that this instruction did not create "a substantial likelihood of a miscarriage of justice" must be accepted by this Court as a determination that there was also no prejudice under *Strickland*.  *See Walker*, 911 F.3d at 636 (federal habeas courts must treat such a state court conclusion as "subsum[ing] both the *Strickland* test for determining constitutionally deficient performance by defense counsel and the *Strickland* test for determining whether such deficient performance was prejudicial"); *see also Zuluaga*, 585 F.3d at 30.  Again, given the Court's prior discussion regarding the strength of the

Commonwealth's case, that implicit SJC determination also was not an unreasonable application of or contrary to clearly established federal law.

        iii. Instruction Regarding Contradictions Between Exhibits and
            Witness Testimony

      Petitioner also challenges the SJC's determinations regarding two additional credibility-related instructions:  the first of which pertained to the role of contradictions in evidence in assessing witness credibility, and the second of which involved the jury's consideration of the video recording of his initial police statement. The Court notes that Petitioner's primary challenge to both of these instructions concerns the impact they had on the jury's consideration of the transcripts and recording from his July 12, 2011 post-arrest interview with police officers and his trial testimony.

      As noted above, following his arrest, Petitioner waived his *Miranda* rights and was interviewed by police.  SA 476; *id.* at 198–239 (redacted transcript of Petitioner's interview with police).  The interview was recorded, and the recording and a redacted transcript of the recording were entered into evidence.  *Id.* at 476, 326.

      In its closing argument, the prosecution highlighted the differences between Petitioner's July 2011 statement to the police and his October 2014 testimony, noting discrepancies that included whether Petitioner owed the victim money, the existence of a fight Petitioner had with the victim prior to the victim's death, the timing of Petitioner's visit to the victim, and the other people present at the victim's apartment.  SA 283–94.

      As set forth in the Court's order above at page four, the SJC discussed the differences between Petitioner's post-arrest interview and his trial testimony.  SA 476–77; *see also id.* at 198–239 (redacted transcript of Petitioner's interview with police); *id.* at 348–49 (Respondent's brief before SJC discussing differences between statement and

90

testimony); ECF No. 20-11 (Petitioner's trial testimony); ECF No. 20-10 at 19–20

(recording entered into evidence).

    The Court addresses here the SJC's determination regarding the trial judge's

instruction about the relationship between witness testimony and exhibits, as follows:

> Now, there's another way to look at credibility.  Say to yourself, you
> know, I believe something in those exhibits.  And you know what?
> What's in those exhibits backs up this witness.  That's called
> corroboration.  *If, on the other hand, the exhibit contradicts the witness,*
> *what do you use that for?  A reason not to believe a witness.*  And go
> back to this jurors.  If someone's being sincere with you, you move onto
> reliability.  If someone's insincere and is winking at the oath, how can
> you believe that person?  So that is what I would say as to your
> consideration of credibility.

SA 323 (emphasis added); *see also id.* at 481.

### a.   SJC Proceedings

    Petitioner argued to the SJC that the instruction improperly and erroneously

dictated to the jurors the impact or weight to be afforded to certain evidence or exhibits—

in particular, his initial interview with police in July 2011, which contradicted in part his

trial testimony.  SA 70–71.  Petitioner argued that the instruction was erroneous because,

contrary to its plain language, a contradiction between an exhibit and a witness's

testimony does "not require that [the jury] disbelieve the witness."  *Id.* at 70.  In support,

Petitioner cited to a state court case, *Commonwealth v. McDuffee*, which addressed the

jury instruction in that case under the Due Process Clause and the Sixth Amendment.[26]  *Id.*

at 70–71 (citing 398 N.E.2d 463, 469 (Mass. 1979)).

---

[26] In *McDuffee*, the defendant insurance agent was charged with perjury in falsely
answering a broker's license renewal form question regarding his criminal
background.  398 N.E.2d at 464.  The trial judge instructed the jury that a statement
made by defendant in the application at issue was, as a matter of law, material when
materiality constituted one of the elements of the crime.  *Id.* at 465–66.

In addition to *McDuffee*, Petitioner also cited to a Fifth Circuit case, *United States v. Williams*, 473 F.2d 507, 509 (5th Cir. 1973), in contending that the instruction invaded the province of the jury and "stepped over the line from instruction to advocacy," by telling the jury to treat any contradiction between Petitioner's initial police interview and his subsequent trial testimony in the very manner advocated for by the Commonwealth. SA 71. He argued that the error was especially prejudicial given the Commonwealth's contention during closing arguments that the jury should look to the statements he made to the police in his recorded interview as opposed to his trial testimony. *Id.*

The Commonwealth countered that the jury instruction was "neutral" and simply advised jurors that contradictions between evidence and witness testimony "could" serve as a reason for the jury to disbelieve the witness. SA 370.

The SJC held that "in the context of the instructions as a whole," Petitioner's counsel's failure to object to this instruction "did not create a substantial likelihood of a miscarriage of justice." SA 482. The SJC interpreted the instruction not to state "that exhibits should be believed over witness testimony, but rather that any contradiction could be considered when assessing witness credibility." *Id.* In support, it noted the judge's previous instruction that the jury had "full authority over the evidence." *Id.*

---

The *McDuffee* court considered the alleged error under the United States Supreme Court's decisions in *Winship* and *Mullaney*. 398 N.E.2d at 466 (citing *In re Winship*, 397 U.S. at 358, and *Mullaney*, 421 U.S. at 684). It noted that "[t]he inappropriateness of instructing the jury that any portion of the government's evidence is undisputed is now well established." *Id.* at 469 (citing *DeCecco v. United States*, 338 F.2d 797 (1st Cir. 1964)). The *McDuffee* court then held that the trial judge committed reversible error when he removed the issue of materiality from the jury with his erroneous instruction. 398 N.E.2d at 469.

b.   Instructional Error/Deficient Performance

Petitioner suggests that the SJC's decision was an unreasonable application of clearly established law regarding his right to testify on his own behalf and put on a defense because it "prevented the jury from considering [his] testimony at all in any instance when it was contradicted by evidence in any exhibits, including his own statements . . . to police."  ECF No. 19 at 24 (citing *Rock*, 483 U.S. at 51–53; *Chambers*, 410 U.S. at 294); *see also* ECF No. 25 at 6 (arguing that the credibility instructions "deprived [Petitioner] of his only possible defense—his own word—and interfered with his right to testify in his own defense").

In support, Petitioner contends that the SJC's interpretation of the instruction was unreasonable based on the plain language of the instruction, which itself stated that a contradiction constituted "[a] reason not to believe a witness."  ECF No. 19 at 22.  In addition to the plain language of the instruction, Petitioner also argues that the SJC unreasonably concluded the instruction was not erroneous when it noted in support the trial judge's additional instruction regarding the jury's "full authority over the evidence." *Id.* at 22–23.  Petitioner contends that contrary to his first trial, the judge did not advise the jury that they had such authority over "some or all of the evidence contained in [the] *exhibit[s]*," instead advising that such authority existed over witnesses only.  *Id.*

In opposition, Respondent erroneously suggests that the SJC did not address deficient performance/instructional error but limited its analysis to prejudice.  ECF No. 29 at 24.  As noted, though, the SJC found no "substantial likelihood of miscarriage of justice,"  which the Court is required to treat as a finding on both *Strickland* deficient performance and prejudice prongs.  *See Mello*, 295 F.3d at 144.  Additionally, the SJC expressly found that there was no instructional error or resulting deficient performance

93

when it concluded that the instruction simply provided that "any contradictions could be considered when assessing witness credibility." SA 481–82. In so holding, the SJC looked to the instructions as a whole in accordance with *Estelle v. McGuire*, 502 U.S. at 72, and further noted the judge's additional instruction to the jury regarding their "full authority over the evidence." SA 481–82.

In addition to mischaracterizing the SJC's determination, Respondent mistakenly asserts that its own arguments relate to *Strickland* prejudice as opposed to the instructional error/deficient performance issue to which they actually pertain. ECF No. 29 at 23. The Court treats below Respondent's arguments as the instructional error/deficient performance arguments that they are.

Respondent asserts that the SJC's interpretation of the instruction was reasonable, and that it "merely reflected straightforward truisms: corroboration tends to bolster credibility whereas contradiction tends to undermine it." ECF No. 29 at 24. Respondent thus suggests that the instruction reinforced the judge's other credibility instructions. *Id.* at 25. In support, Respondent again points to the judge's statement to the jury that it had "full authority over the evidence."[27] *Id.* at 24–25.

The Court agrees with Petitioner that the plain language of the instruction does not suggest simply that a contradiction between an exhibit and witness testimony "could" be considered in evaluating a witness's credibility, and the SJC's characterization as such was unreasonable. SA 482, 323. Rather, the instruction suggests that "[i]f . . . the exhibit

---

[27] Respondent fails to address Petitioner's related argument that the trial judge failed to adequately address the jury's authority regarding the exhibits in the same manner that it addressed witness testimony.

contradicts the witness," the jury then "use[s]" that as "[a] reason not to believe a witness."[28]  *Id.* at 323.   Regardless of the intention behind the instruction, it problematically suggested to the jury that it should resolve any contradiction between witness testimony and an exhibit in favor of the exhibit.  *See Francis*, 471 U.S. at 324 n.9 (noting that jurors are "presume[d to] . . . attend closely the particular language of the trial court's instructions in a criminal case and strive to understand, make sense of, and follow the instructions given them").

Again, though, this particular mischaracterization is not dispositive of the Court's broader § 2254(d)(1) analysis of the key issue:  that is whether the SJC's determination that this instruction was not erroneous—and that, accordingly, trial counsel was not deficient in failing to object—constituted an unreasonable application of or was contrary to clearly established federal law.

Turning to the SJC's additional determination that "the judge had previously instructed the jury that they had 'full authority over the evidence,' including whether to believe or disbelieve some or all of a witness' testimony," the Court disagrees with Petitioner that this finding was unreasonable.  *See* SA 482.  Petitioner concedes that the SJC accurately found that the trial judge instructed that the jury had "full authority" over witness testimony.  ECF No. 19 at 22.  Petitioner nonetheless implies that the SJC's finding was unreasonable because, contrary to Petitioner's first trial, the judge did not

---

[28] The instruction is posed as a question followed by an answer:  "If, on the other hand the exhibit contradicts the witness, what do you use that for?  A reason not to believe a witness."  SA 323.  Notably, the question is not posed permissively, e.g., "what *may* [or *can*] you use that for?"  Instead, as given, the instruction suggests "if A [contradiction], then B [reason to disbelieve the witness]."

advise the jury at his second trial that it had the same authority over "some or all of the evidence contained in [the] *exhibit[s]*" as it did over the witness testimony. *See id.* at 22–23.[29]

Here, the SJC accurately recounted the judge's instruction. SA 482, 317. In instructing the jury that it had "full authority over *the evidence*," the trial judge noted that the jury could "have an exhibit or . . . witness before [it]." *Id.* at 317 (emphasis added). The trial judge then appears to have used witness testimony—as opposed to exhibits—in his immediately following example of the gradations in credibility that the jury could afford the evidence.[30] *Id.* While the trial judge's failure to include a similar example

--------------------------------

[29] Petitioner cites to transcripts from his first trial that resulted in a hung jury. *See* ECF No. 19 at 23 n.7 (citing to "T 7/2/2014, 76–77"). However, the transcripts from Petitioner's first trial are not in the record before this Court; Respondent explicitly noted that it excluded transcripts from the first trial. *See* SA iii (noting that transcripts "from the petitioner's first trial which ended in a mistrial . . . are not relevant to the petition for habeas relief"). Thus, Petitioner cites to evidence outside of this federal habeas court's record. The Court is therefore unable to confirm the instructions that were given at Petitioner's first trial, and, as noted, Respondent failed to address this issue in its opposition brief filed before this Court. *See* ECF No. 29 at 24–25. Nevertheless, the Court notes that, even if Petitioner's assertion is accurate, that would not change the Court's ultimate conclusion regarding this instruction under § 2254(d).

[30] The trial court advised the jury in pertinent part:

You can have an exhibit or you can have a witness before you, and now comes time to judge whether or not that witness' words are believable, whether you believe that witness. You're not limited to yes or no. Of course you can say, "I don't believe a word of it." You can say, "I believe all of it." But jurors, you're also entitled to say, "I believe some of it. I don't believe other parts." That's your choice.

SA 317.

regarding exhibits may have rendered the instruction less than perfect, Petitioner has not shown federal constitutional error.

Additionally, to the extent that Petitioner argues that the SJC unreasonably failed to explicitly account for the absence of instructive examples regarding the exhibits, the Court disagrees.  Absent citation to the record, Petitioner contends that "the only direct instruction the jury was given as to exhibits was that they could be used in one of two ways:  (1) either to corroborate a witness's testimony or, (2) if the exhibit contradicted a witness's testimony, as a reason to disbelieve that witness."[31]  ECF No. 19 at 23.  The Court's review of the record confirms that this is not the case, though.  In discussing the jury's "job" of factfinding, the trial judge explicitly mentioned the exhibits in addition to witness testimony, advising the jury as follows:

> Examining the above points [of fact] involves considering the evidence, the thirty-eight exhibits—excuse me—the sixty-six exhibits, the thirty-eight witnesses.  And you determine from that what you believe, and you also determine something else that's important.  The degree to which you believe it.  The confidence you have in that witness' credibility.

SA 318–19.

In arguing that the SJC's decision is unreasonable, Petitioner again cites generally to clearly established Supreme Court law that provides a criminal defendant a due process right "to a fair opportunity to defend against the State's accusations," *Chambers*, 410 U.S. at 294, and to testify in his own defense based on the Fifth Amendment privilege against

---

[31] Respondent failed to address this issue.  *See* ECF No. 29 at 24–25.

self-incrimination, the Due Process Clause, and the Sixth Amendment, *Rock*, 483 U.S. at

51–53.  *See* ECF No. 19 at 24.

In his brief to the SJC, Petitioner also cited to the Fifth Circuit's decision in

*Williams*, 473 F.2d at 509.  SA 71.  In *Williams*, on direct appeal, the Fifth Circuit held that

a district judge's "prefatory remarks" to the jury, where the judge dramatized his

comments by noting how infrequently he exercised the power and where the tenor of his

comments suggested to the jury that he was afraid that the jury might acquit the defendant,

when "coupled with" an additionally erroneous jury instruction, constituted reversible

error.  473 F.2d at 511–12.  Regarding the prefatory remarks, the Fifth Circuit in *Williams*

relied on the Supreme Court's decision in *Quercia v. United States*.  *Williams*, 473 F.2d at

510 (quoting in part *Quercia v. United States*, 289 U.S. 466, 470 (1933) (holding that "a

trial court must be ever aware that 'the influence of the trial judge on the jury is

necessarily and properly of great weight and his lightest word or intimation is received

with deference, and may prove controlling'")).  In addition to the prefatory remarks, the

*Williams* court found that the trial judge's "*Blue*-type" jury instruction or charge there—a

charge that the Fifth Circuit had previously expressly disapproved of and held to be

prejudicial error—constituted error.[32]  473 F.2d at 511–12 (citations omitted).

---

[32] A "*Blue*" charge refers to a jury instruction similar to that in *United States v. Blue,*
430 F.2d 1286 (5th Cir. 1970), which the First Circuit has subsequently
characterized as "concerning comparability of credibility," and, in particular, the
"credibility specifically in terms of choosing between government witnesses and a
defendant's [testimony]."  *United States v. Guest*, 514 F.2d 777, 780 (1st Cir. 1975);
*see also United States v. Rohrer*, 708 F.2d 429, 432 (9th Cir. 1983) (citing *United
States v. Oquendo*, 490 F.2d 161, 164–66 (5th Cir. 1974)) (describing a "*Blue*
charge," like that discussed in *Williams*, as "[a]n instruction that appears to reduce
a criminal case to acceptance or rejection of a government witness' testimony," such

In *Williams,* like here, the defendant provided differing statements to police upon arrest and during his testimony at trial.   Specifically, the *Williams* petitioner had been charged under the Dyer Act, 18 U.S.C. § 2313, with knowing purchase of a stolen vehicle. 473 F.3d at 508.  While the petitioner was en route to jail following an arrest on unrelated charges, he discussed the automobile with an FBI agent, and then signed a statement once he arrived at the jail regarding the circumstances surrounding his purchase of the automobile.  *Id.* at 508–09 & n.2.  In his statement, the petitioner admitted that he "knew the car had to be stolen because it was so cheap and [he] received no papers with it."  *Id.* at 509.

Subsequently, at trial, the *Williams* petitioner testified in his own defense that, contrary to his prior statement, he believed the car was so cheap because it had "been previously wrecked," and denied knowing it was stolen until his conversation with the FBI agent.  473 F.3d at 509.  He also denied that his prior written statement was accurate.  *Id.*

Thereafter, the *Williams* judge advised the jury as follows regarding the petitioner's prior written statement:

> Now, ladies and gentlemen, in the Federal Court in criminal cases, the judge has the right to comment on the evidence.  It is something that I rarely do.  I think we tried some seven cases here this week and I made no comment on the evidence in any of these cases.  At times I feel that it becomes the duty of the judge to comment on the evidence, particularly where there is a direct conflict in the evidence.  Before doing so, and one reason I rarely ever comment on the evidence is that in making a comment on the evidence, I must tell you, to begin with, that you have a right to completely disregard any comment that I might make, because it is your duty to determine the facts and not mine.
>
> ***

---

that the "mistake, if not corrected, can effectively deprive the defendant of his right to a jury trial").

> If you believe that this statement is a true statement and that it was voluntarily given, and if you believe the testimony of the officers in this case, Mr. Byron in particular, who took this statement, the defendant has admitted guilt in this statement.
>
> On the other hand, if you believe the defendant's explanation of why he gave this statement of what happened and disbelieve this statement and disbelieve the testimony of the agent, you should find the defendant not guilty.

473 F.2d at 509 n.3.

In holding that the jury instruction constituted prejudicial error, the *Williams* court found that it "erroneously narrowed the credibility issue to an all or nothing proposition" such that the only way by which a jury could reach a not guilty verdict was if it "(1) believe[d] the defendant's explanation of why he gave the [original] statement; *and* (2) disbelieve[d] the [original] statement; *and* (3) disbelieve[d] the testimony of the government witness." 473 F.2d at 511. It further noted that the instruction had the effect of "condition[ing] the belief of defendant's explanation of why he made [his original] statement on the disbelief of [the government agent's] testimony." *Id.* In doing so, the court noted that the instruction "foreclosed" the jury's "range of choices," which "could reasonably be construed as—or ha[d] the practical effect of—directing a verdict of guilty" by "exceed[ing] the bounds of fair and impartial comment." *Id.*

Following the Fifth Circuit's decision in *Williams*, on direct appeal, the First Circuit in *United States v. Guest*, addressed an instruction regarding the comparative credibility of government witnesses, and distinguished in part the Fifth Circuit cases. 514 F.2d 777, 779 (1st Cir. 1975). The defendant in *Guest* was charged with receiving methaqualone after importation into the United States without customs inspection and declaration. *Id.* at 778. The district judge initially instructed the jury that if it "believed the government witnesses[,] it could draw the inference that defendant took possession of

the car and its merchandise with the requisite knowledge and intent; that it could not draw such inference if it disbelieved those witnesses or believed the defendant; and that 'it comes down in the last analysis to your assessment of the credibility of the witnesses.'" *Id.* Following the instruction, government counsel advised the judge that the First Circuit had criticized a similar type of instruction, and the district judge thereafter advised the jury that it was "revoking" its prior instruction but nevertheless reiterated "that the jury could draw the inference of knowledge [one element of the crime] if it believed the government witnesses." *Id.*

The First Circuit found no "plain error" and distinguished the case from the Fifth Circuit cases, finding an absence of similar "constant harping on the theme of comparative credibility of government and defense witnesses" as compared to that which existed in the Fifth Circuit case. *Guest*, 514 F.2d at 779 (discussing *United States v. Oquendo*, 490 F.2d 161 (5th Cir. 1974)). The First Circuit, however, cautioned trial judges about "discuss[ing] credibility specifically in terms of choosing between government witnesses and a defendant."[33] *Id.* at 780.

Again, though, as discussed above with the bias or interested witness jury instruction, "clearly established Federal law" is that determined by the Supreme Court— not by circuit precedent. Thus, circuit decisions regarding "*Blue*-type" jury instructions like *Williams* and *Guest* are not controlling on federal habeas review. *See Brown v.*

---

[33] In *Guest*, the First Circuit did not address any Supreme Court law, including *Quercia*, on the issue. 514 F.2d at 779. It also does not appear to have spoken further on the issue following its decision in *Guest*.

*Davenport*, 596 U.S. at 136; *Parker v. Matthews*, 567 U.S. at 48–49.  Again, there is no

law from the Supreme Court—or even this circuit—suggesting otherwise.[34]

*Williams*, however, as cited by Petitioner, also addressed the Supreme Court's decision in

*Quercia*, 289 U.S. at 466, which itself concerned a judge's duty to be fair and impartial.

473 U.S. at 510.  In *Quercia*, the Supreme Court reversed the appellant's conviction

because the trial judge stated to the jury during the jury charge that he believed the

defendant was lying.  289 U.S. at 466.  In particular, the judge instructed:

> And now I am going to tell you what I think of the defendant's
> testimony.  You may have noticed, Mr. Foreman and gentlemen, that he
> wiped his hands during his testimony.  It is rather a curious thing, but
> that is almost always an indication of lying.  Why it should be so we
> don't know, but that is the fact.  I think that every single word that man
> said, except when he agreed with the Government's testimony, was a
> lie.

*Id.* at 468.

The *Quercia* Court acknowledged that

> [i]n charging the jury, the trial judge is not limited to instructions of an
> abstract sort.  It is within his province, whenever he thinks it necessary,
> to assist the jury in arriving at a just conclusion by explaining and
> commenting upon the evidence, by drawing their attention to the parts

---

[34] Regardless, though, the instructions given in *Williams* and *Guest* differ from the instruction at issue here.  Both the *Williams* and *Guest* instructions concerned comparative credibility between government witnesses and the defendant's testimony—not conflicts between the same defendant's testimony and a prior recorded statement.  *See Williams*, 473 F.3d at 509 & n.3; *Guest*, 514 F.2d at 779; *see also United States v. Womack*, 454 F.2d 1337, 1344 (5th Cir. 1972) (holding that "*Blue*" charge in case resulted in an instruction to the jury that "there was 'overwhelming' evidence if they believed the testimony of the Government witnesses and the inferences that the Government asked the jury to draw from the facts" (emphasis omitted)).  Additionally, the Fifth Circuit's related concern that *Blue*-type instructions advise "the jury to treat the matter of proof as a fair fight between the United States and (defendant) rather than as one weighted in his favor by the reasonable doubt rule," *Oquendo*, 490 F.2d at 166 (Gee, J., concurring), is not present here where the jury considered statements and testimony that were both *from the Petitioner*.

> of it which he thinks important, and he may express his opinion upon
> the facts, provided he makes clear to the jury that all matters of fact are
> submitted to their determination.

*Id.* at 469. The *Quercia* Court concluded that the instruction in that case was erroneous

because it precluded the jury's fair and dispassionate consideration of the evidence. The

Court determined that the trial judge had exceeded the scope of his discretion as "governor

of the trial," and that his "error" was "highly prejudicial." *Id.* at 469, 472. The Court,

invoking its supervisory power, reversed the trial judge. *Id.*

At least one other judge on this Court has, however, acknowledged, that the

Supreme Court's decision in *Quercia* is of questionable applicability to this Court's federal

habeas review. *See Vasquez v. DiPaolo*, No. CIV. 96-cv-12261, 1998 WL 428012, at *10

(D. Mass. July 23, 1998). That is because in *Quercia*, the Supreme Court acted pursuant

to its supervisory powers as opposed to its authority to enforce the Due Process Clause of

the Fifth Amendment. *Id.* (citing *Quercia*, 289 U.S. at 469). "Although Supreme Court

decisions, invoking supervisory power, concerning the scope and limits of judicial

behavior during trial are binding on this [C]ourt, they do not similarly constrain the

justices of the Massachusetts [SJC]." *Ballinger v. Byron*, 98 F. Supp. 2d 119, 127 (D.

Mass. 2000); *see Harris v. Rivera*, 454 U.S. 339, 344–45 (1981) ("Federal judges have no

general supervisory power over state trial judges; they may not require the observance of

any special procedures except when necessary to assure compliance with the dictates of

the Federal Constitution."). *But see Wallace v. Garman*, No. 18-cv-03509, 2020 WL

13120589, at *13–14 (E.D. Pa. Oct. 2, 2020) (citing to *Quercia*, 289 U.S. at 469, as

"clearly established federal law as determined by the Supreme Court," in rejecting

petitioner's § 2254 habeas claim regarding jury instructions), *report and recommendation*

*adopted in part*, No. CV 18-3509, 2022 WL 866679 (E.D. Pa. Mar. 23, 2022), *aff'd sub*

*nom. Wallace v. Superintendent Rockview SCI*, No. 22-1737, 2023 WL 3773671 (3d Cir. June 2, 2023).

This Court need not decide whether *Quercia* applies, though, because it concludes that, while imperfect, the jury instruction here did not overstep the boundaries of appropriate comment outlined in *Quercia*, and thus was not contrary to or an unreasonable application of Supreme Court law as defined by *Quercia*. Unlike *Quercia*, this is not a case where the trial judge "actively injected himself into the entire trial proceeding" or "made extremely prejudicial comments that pervaded the overall fairness of the trial and which tended to accentuate and emphasize the government's case." *Smith v. MacEachern*, No. 09-cv-10434, 2019 WL 2552271, at *17 (D. Mass. Feb. 21, 2019) (quoting *Alidani v. Dooley*, 365 F.3d 635, 640 (8th Cir. 2004)), *report and recommendation adopted*, No. 09-cv-10434, 2019 WL 2543504 (D. Mass. June 20, 2019), *aff'd*, No. 19-1668, 2025 WL 382107 (1st Cir. Jan. 22, 2025). Nor did the judge make "extremely egregious and prejudicial" comments about the defendant's credibility. *Id.* (quoting *Alidani*, 365 F.3d at 640).

Furthermore, the instruction also did not impermissibly shift onto Petitioner the burden to prove an element of the crime by advising that part of the government's case was undisputed, thus rendering the SJC's decision regarding instructional error/deficient performance unreasonable. *Cf. McDuffee*, 398 N.E.2d at 469 (cited by Petitioner at SA 70–71). While the instruction here may have favored the Commonwealth's position regarding the credibility of Petitioner's interview statements over his trial testimony, it did not shift to Petitioner the burden to prove that he was not the perpetrator.

Petitioner, in fact, denied committing the crime in both his initial statement to police and in his trial testimony. *See* SA 220, 222, 235 (Petitioner's July 2011 statement to police that he "bought some drugs and left" the victim's house on the night of the homicide prior to the murder or the fire); ECF No. 20-11, at 26–27, 83–84 (Petitioner's trial testimony regarding night in question). Although the challenged instruction may have boosted the credibility of Petitioner's initial statement over that of his testimony, the instruction did not create an impermissible presumption in favor of the government on an element of the crime.

For these reasons, the SJC's determination that there was no instructional error or deficient performance regarding this instruction was not an unreasonable application of or contrary to clearly established law. Alternatively, even if, contrary to the Court's conclusion above, there was an instructional error under *Estelle*, 502 U.S. 62, and, as a result, deficient performance under *Strickland*, the Court concludes that federal habeas relief is not warranted because the SJC's determination regarding any resulting prejudice was itself neither contrary to nor an unreasonable application of clearly established federal law.

### c.   Prejudice

As stated above, the appropriate inquiry as to prejudice asks whether "'fairminded jurists' would all agree" that the SJC's determination that there was no reasonable probability that the result of the proceeding would have been different had counsel objected to the challenged instruction was itself an unreasonable application of clearly established federal law. *See Jewett*, 634 F.3d at 75 (quoting *Harrington*, 562 U.S. at 101–02); *see Harrington*, 562 U.S. at 104–05 (analyzing *Strickland*, 466 U.S. at 694).

The only true prejudice finding that the SJC made on this issue was its determination that "counsel's failure to object to this instruction did not create a substantial likelihood of a miscarriage of justice."[35]  SA 482.  For all of the reasons discussed with the other jury instructions above, the Court must interpret this statement to constitute a determination that there was also no prejudice under *Strickland*.  *See Walker*, 911 F.3d at 636; *see also Zuluaga*, 585 F.3d at 30.

Petitioner contends that the SJC's prejudice determination was unreasonable because the instruction was "especially damaging" given the Commonwealth's jury argument that it should believe his statement to police over his trial testimony.  ECF No. 19 at 23.  While, for the reasons above, the Court agrees that the instruction was flawed, in accordance with the Court's prior discussion regarding the strength of the Commonwealth's case, the Court cannot say that the instruction violated clearly established federal law from the Supreme Court such that "fairminded jurists would all agree" that the result of the proceeding would have been different had counsel objected to the instruction.  *See Harrington*, 562 U.S. at 104–05.

       iv.  Instruction Regarding Jury Being "Controlled" by the Video Recording

Finally, Petitioner challenges the trial court's instruction given after closing arguments, and immediately following instructions to the jury regarding its consideration of testimony from fact and opinion witnesses.  SA 326.  In that challenged instruction, the trial judge addressed the video recording of Petitioner's initial police interview, advising:

---

[35] As discussed previously, Respondent is mistaken in asserting that "the SJC only focused on prejudice here."  ECF No. 29 at 21.

> You've got a video, jurors.  You've got a video of what the interview consisted of at the Attleboro police station.  That's going to be given to you.  You're going to have the ability to play it.  *Indeed, you should be controlled by it.  What he said on the video, you're going to see.  You're going to see it.  If it conflicts with what the lawyers said he said, you're going to follow the video.*

SA 326 (emphasis added); *see also id.* at 482.

Petitioner argued to the SJC that, in combination with the preceding challenged instruction regarding contradictions between exhibits and witness testimony, the above instruction operated to reinforce that "the video evidence should control [a juror's] thinking during deliberations over other evidence and testimony *and* over any misstatements made by the lawyers."  SA 72.  He contended that the above instruction undermined his credibility and conveyed to the jury that it should place greater weight on his recorded statements than on his trial testimony, and, in doing so, improperly mirrored the Commonwealth's closing argument and position.  *Id.* at 72–73.

Respondent countered that when viewed with the trial judge's earlier instruction that a lawyer is not a witness, the above instruction simply reiterated that evidence is derived from witnesses and not lawyers.  SA 371–72.

The SJC found that "the instruction was not error, and consequently[,] trial counsel was not ineffective for failing to object."  SA 482.  In finding no instructional error, the SJC interpreted the instruction as "clearly . . . comparing the recording to the lawyer's statements," but "not . . . to the other evidence."  *Id.*  In support, it found that "a reasonable juror would have understood this instruction as referring back to an instruction the judge [gave] before closing arguments" regarding attorneys.[36]  *Id.*  The SJC

---

[36] Prior to closing arguments, the judge admonished the jury generally regarding the role of lawyer's arguments as follows:

nevertheless acknowledged that it "would have been prudent for the judge to say that *all the evidence*—not just the video recording—control[led] over statements by the attorneys." *Id.* (emphasis added).

Petitioner argues before this Court that the SJC unreasonably applied clearly established law because the instruction—when considered with the preceding instructions—deprived him of his due process rights and his right to testify on his own behalf and put on a defense, citing again to *Rock*, 483 U.S. at 51–53, and *Chambers*, 410 U.S. 284, 294. ECF No. 19 at 24. He contends that in light of the prior challenged instruction, the SJC's interpretation of how a "reasonable juror" would understand this instruction was itself unreasonable. *Id.* at 23. Petitioner argues that a "reasonable juror" would not have understood the trial court to instruct that the video was controlling only in "instances where . . . statements by the attorneys" "conflicted with what the jurors saw in the video." *Id.*

Respondent counters that the SJC's factfinding and conclusions were reasonable, and again summarily argues that Petitioner cannot establish that his counsel was deficient; nor can he establish prejudice. ECF No. 29 at 22–23.

---

Members of the jury, you are about to hear the final arguments, and let me say this. A lawyer is obviously not a witness. Thus, a lawyer can never provide you with information that is not found directly in the evidence or inferentially in the evidence. Now, let's say you hear something and say to yourself, "I don't think that's in the evidence, and I don't think we can infer that. I think that I've heard something new," don't hesitate. Don't say to yourself, "Well, the lawyer said it. It must have been there, and I must have overlooked it." Don't say that individually. Don't say that collectively. A lawyer is just as liable to human error as you are. So just keep that in mind as both lawyers argue to you.

SA 240.

The Court agrees that the SJC's interpretation of the plain language of this instruction, both standing alone and when considered along with the other jury instructions, was unreasonable. The challenged instruction followed in much closer proximity to the prior challenged instruction regarding contradictions between exhibits and witness testimony than it did to the trial court's instruction regarding the jury's treatment of attorney arguments. And, the instruction expressly advised jurors that they should "be controlled by" the video. SA 326. As phrased, that statement was not limited to instances in which the video conflicted with lawyer's statements; nor would a "reasonable juror" interpret the instruction as so providing. Instead, a reasonable juror would likely have interpreted the instruction to dictate that the video generally was "controlling" evidence that they should follow.

As such, the Court agrees with Petitioner that this instruction was problematic because it, in essence, dictated that the jury give "controlling" weight to Petitioner's initial video recorded police statements over his trial testimony. Moreover, given this instructional error, Petitioner's trial counsel's failure to object could be considered deficient under *Strickland.*

However, as noted with the instructions discussed above, to be entitled to federal habeas relief, Petitioner must also demonstrate *Strickland* prejudice under the "doubly deferential" AEDPA standard. Unlike the prior challenged instructions, the SJC did not address prejudice with this instruction, and, for the first time, made no findings as to whether counsel's failure to object "create[d] a substantial likelihood of a miscarriage of justice." SA 482.

Nevertheless, where, as here, "a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief."[37] *Harrington*, 562 U.S. at 98–100.

In accordance with its prejudice discussions above regarding the other challenged instructions, given the strength of the Commonwealth's case, the Court cannot say that there is no reasonable basis by which the SJC could have found there was no prejudice. In other words, Petitioner cannot demonstrate that "fairminded jurists would all agree" that the result of the proceeding would have been different had counsel objected to this instruction. *See Harrington*, 562 U.S. at 104–05.

v.  Instructions Considered Cumulatively

Petitioner finally argues that the SJC erred when it failed to consider the cumulative effect of the jury instruction errors in light of his ineffective assistance of counsel claims. ECF No. 19 at 26–28. Respondent disagrees, arguing that the SJC properly considered the jury instructions as a whole under *Estelle*, 502 U.S. at 71–72, with each instructional claim. ECF No. 29 at 28–29.

The Court agrees that the SJC does not appear to have separately reached Petitioner's claim regarding cumulative error. *See* SA 79–83 (arguing that consideration of the instructions "in their entirety" demonstrates that Petitioner's federal constitutional rights were violated); *id.* at 484 (SJC decision). Any SJC error in failing to reach the issue, though, was harmless for two reasons.

----

[37] In such cases where the state court's reasoning is absent, "an independent review of the record is required to determine whether the state court clearly erred in its application of controlling federal law." *Gaines*, 272 F. Supp. 2d at 128 (citing *Delgado*, 223 F.3d at 982).

First, as Respondent notes, the SJC reviewed and considered the instructions in their entirety in conjunction with Petitioner's individual claims of instructional error. *See* SA 480–84. Second, this Court has found no prejudice with any of the instructional/IAC errors as set forth above. "Absent any particularized error, there can be no cumulative error." *Field*, 37 F.4th at 22 (quoting *Williams v. Drake*, 146 F.3d 44, 49 (1st Cir. 1998)). Given this absence of prejudice, Petitioner is not entitled to relief on his cumulative error claim. *See id.*

## VI.    CONCLUSION

For the reasons above, the court **DENIES** Petitioner's petition for Writ of Habeas Corpus. ECF No. 1.

**SO ORDERED.**

July 29, 2025                                          */s/ Allison D. Burroughs*
                                                      ALLISON D. BURROUGHS
                                                      U.S. DISTRICT JUDGE